**2018 UT App 236**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
HOWARD WAYNE HOOD,
Appellant.

Opinion
No. 20160610-CA
Filed December 20, 2018

Third District Court, Salt Lake Department
The Honorable Randall N. Skanchy
No. 131910817

Marshall M. Thompson and Andrea J. Garland,
Attorneys for Appellant

Sean D. Reyes and Jeffrey S. Gray, Attorneys
for Appellee

JUDGE DIANA HAGEN authored this Opinion, in which JUDGE
KATE APPLEBY[1] concurred. JUDGE MICHELE M. CHRISTIANSEN
FORSTER concurred in part and concurred in the result,
with opinion.

HAGEN, Judge:

¶1     Howard Wayne Hood appeals his convictions for rape
and forcible sodomy. Before trial, Hood sought to exclude
evidence that he had been excommunicated from The Church of
Jesus Christ of Latter-day Saints, arguing that the evidence was
inadmissible "other act" evidence under rule 404(b) of the Utah
Rules of Evidence. The district court admitted the evidence to

---

1. Judge Kate A. Toomey has resumed the use of her birth name
and is now known as Judge Kate Appleby.

explain the context of Hood's relationship with the alleged victim. We conclude that this was a proper, non-propensity purpose and that the evidence was relevant to assessing the victim's credibility on the question of consent. But because we also conclude that the danger of unfair prejudice substantially outweighed the probative value of the evidence and that its admission was harmful, we vacate Hood's convictions and remand for a new trial.

## BACKGROUND

### *Relationship Between Hood and W.B.*

¶2      Hood met the alleged victim, W.B., on a dating website in March 2013. W.B. was a member of The Church of Jesus Christ of Latter-day Saints and assumed that Hood was as well because his profile picture showed a photograph of the church's founder in the background. According to W.B., on their first date, Hood told her he had not gone to church for some time but had attended that same day and wanted to resume his involvement in the church. He said he was grateful to meet someone like her who was a member so that she could help him come back into "full fellowship" with the church. At trial, W.B. explained that "full fellowship" means taking steps to "live the teachings of the gospel" and being able to "take the sacrament"[2] and "receive

---

2. "The sacrament is the formal blessing and administering of bread and water representing the body and blood of Christ to Church members," which is "the equivalent of communion in many other Christian churches." *Sacrament*, The Church of Jesus Christ of Latter-day Saints Newsroom, www.mormonnewsroom .org/article/sacrament [https://perma.cc/L7FL-3875].

further blessings." At some point, Hood disclosed to W.B. that he had been excommunicated from the church.[3]

¶3    Over the next several months, Hood and W.B. continued dating, but their relationship was volatile and involved a series of breakups and reconciliations. W.B. acknowledged that the couple had engaged in various acts of sexual intimacy short of intercourse during their relationship. She testified that although such physical intimacy before marriage conflicted with her religious beliefs, Hood manipulated her into submitting to these acts.

¶4    W.B. also testified that she told Hood she would not engage in premarital sexual intercourse because church doctrine forbade it. Despite knowing her opposition, Hood once pushed her against the kitchen wall and penetrated her vaginally and

---

3. In the Church of Jesus Christ of Latter-day Saints, excommunication, or loss of church membership, is the "most serious sanction the disciplinary council may prescribe." *Church Discipline*, The Church of Jesus Christ of Latter-day Saints Newsroom, www.mormonnewsroom.org/article/church-discipline [https://perma.cc/J8XZ-WW84]. Importantly, church discipline is not reserved solely for "apostasy," or public opposition to church doctrine. *Id.* "Church discipline may be required for someone guilty of serious criminal offenses." *Id.* In particular, the church expresses "zero tolerance for abuse of any kind, including child abuse, spousal abuse, sexual abuse or child pornography, and anyone engaged in these practices would rightly face both criminal prosecution and Church discipline." *Id.* Other "serious personal sin, including abortion or sexual sin, may require disciplinary action as part of the repentance process," but excommunication is considered "a course of last resort and is only taken when less serious disciplinary measures are insufficient." *Id.*

anally with his penis while saying, "Isn't this a fun game we're playing?" According to W.B., she told Hood, "No, . . . this isn't fun." After this incident, she met with her ecclesiastical leader, the bishop, and confessed that she "had allowed" the act even though she did not want it to happen. She testified that the bishop counseled her to refrain from participating in the sacrament for three weeks.

¶5 At trial, Hood painted a different picture of the couple's relationship. He testified that W.B. was eager to engage in sexual activity, including oral sex and intercourse, and "never talked to [him] about not wanting to have sex because she was taking her religion seriously." Hood testified that he and W.B. talked little about religion and that the topic was not central to their relationship. According to Hood, they had a sexual relationship for months before he told W.B. that he was trying to return to the church after having been excommunicated.

*Charged Conduct*

¶6 On October 19, 2013, W.B. left Hood's apartment after an argument, inadvertently leaving her checkbook there. That night, Hood sent her a text that she had forgotten her checkbook, and W.B. responded, asking if she could retrieve it the next day. Because of the argument, she suggested he hand her the checkbook at the door if he did not want her to come into the apartment. But when she arrived the next day, Hood hugged her and told her he was sorry for what had happened. W.B. testified she felt ill that morning and told Hood that she was "really tired." He led her into his bedroom and suggested she take a nap.

¶7 W.B. testified that, after she fell asleep, Hood entered the room, removed her pants, and performed oral sex on her. When she woke, Hood held her down and ignored her pleas to stop. According to W.B., she was sobbing when Hood put on a

condom. She begged, "No, Howard, no," then froze in "complete and utter shock" while he raped her.

¶8 In contrast, Hood testified that W.B. initiated the encounter by suggesting they take a nap together. According to Hood, they began "making out" in the bedroom and he performed oral sex on W.B. only after she asked him to give her an orgasm. Hood testified that, after the oral sex, he retrieved condoms from his car before returning to the bedroom to have intercourse with her.

*Motion to Exclude Under Rule 404(b)*

¶9 The State charged Hood with one count of rape and one count of forcible sodomy. At trial, Hood voiced concern over whether the State intended to elicit testimony regarding his excommunication from the church.[4] Hood acknowledged that although it may be permissible to explain that he was not a church member, it was a 404(b) issue "to say he's been excommunicated in the past." The district court initially agreed that there was "no reason" for such evidence. The State objected, arguing that Hood's excommunication was a central component of his relationship with W.B. The State explained that W.B. would testify that "Hood made it very clear that he was excommunicated, but that he wanted to come back to the church

---

4. Before trial, the State filed a notice of its intent to offer evidence under rule 404(b) of the Utah Rules of Evidence, but it did not include the evidence of Hood's excommunication. Given its arguments on appeal, the State presumably concluded that such evidence fell outside the scope of rule 404(b). Hood did not ask the district court to exclude the excommunication evidence based on lack of notice, nor has he raised that issue on appeal. *See* Utah R. Evid. 404(b)(2) (requiring reasonable notice of other act evidence that the prosecutor intends to offer at trial).

and that . . . plea for help, spiritually speaking, was one of her reasons for staying in contact with him." The State posited that Hood's excommunication and his professed desire to return to the church were "very probative of why [W.B.] maintain[ed] contact with this person who [was] making . . . repeated [sexual] overtures."

¶10    Hood conceded that W.B. could testify that he "left the church, . . . he wasn't a member, he's trying to come back to the church," but he objected to the admission of evidence that he had been excommunicated. The district court questioned whether it was possible to "shape or mold [W.B.'s] testimony beyond what the facts actually are" to avoid mentioning the excommunication. It noted that Hood's status in the church was "a fairly central part of the ongoing relationship between these parties" and ruled that it would allow Hood's statements to W.B. regarding his excommunication.

*Use of Excommunication Evidence at Trial*

¶11    At trial, the State presented evidence that Hood had been excommunicated from the church but never disclosed what Hood did to merit that sanction. In its opening statement, the State referred to Hood's professed desire to "get back [to being] active in the church" and his pleas for W.B. to help him do so as the method he used to manipulate W.B. into forgiving him and staying in the relationship. The prosecutor did not use the term "excommunication" or otherwise refer to official church discipline.

¶12    During trial, however, the State elicited testimony about Hood's excommunication from three witnesses. First, W.B. testified that Hood told her he had been excommunicated. Because he had lost his membership in the church, Hood told her that he needed to "retake the discussions" with the church

missionaries and then "be found worthy to be rebaptized to be able to have the blessings of the gospel in his life."

¶13    Second, during cross-examination, Hood confirmed that he told W.B. of his excommunication. In a subsequent line of questioning, the State reiterated that Hood had been "officially excommunicated from the church."

¶14    Third, the State offered testimony from Hood's ex-wife about his excommunication. She testified that, soon after they met, Hood told her he "was trying to get in good standing with the church because he had been excommunicated." She explained that "there's certain things that if you do them, like morality, different things like that, then you have to go and confess to your bishop or stake president or whatnot, and then . . . they hold a council, and if they find that you're lacking, they can excommunicate you." Hood's ex-wife testified that obeying the "law of chastity" was important to maintaining good standing in the church.

¶15    In its closing argument, the State directly referred to Hood's excommunication. The prosecutor argued that Hood's professed "interest in rekindling the flame of faith" explained why the "naïve" and "religious" W.B. continued to forgive and wanted to "believe that he will be better."

¶16    The jury convicted Hood of rape and forcible sodomy. He appeals those convictions.

ISSUE AND STANDARD OF REVIEW

¶17    Hood argues that the district court erred by allowing the State to elicit testimony about Hood's "prior conviction for an unknown transgression in an . . . ecclesiastical court." A district court's decision to admit other-act evidence under rule 404(b) is

reviewed for abuse of discretion. *See State v. Thornton*, 2017 UT 9, ¶ 56, 391 P.3d 1016. Under this "deferential standard of review," the question before the appellate court "is not whether we would have admitted [the] evidence. It is whether the district judge abused his broad discretion in doing so." *Id.*

¶18    Hood raised three additional issues on appeal, but because his first claim of error requires us to vacate his convictions and remand for a new trial, it is unnecessary for us to reach the remaining issues.[5] *See State v. Moore*, 2009 UT App 386, 223 P.3d 1137.

---

5. "We recognize that we may address issues raised on appeal that are likely to arise again upon remand." *State v. Moore*, 2009 UT App 386, 223 P.3d 1137; *see also State v. Ogden*, 2018 UT 8, ¶ 49, 416 P.3d 1132 ("Although it is unnecessary to our decision, we retain the authority to reach issues when we believe our analysis could prove helpful on remand.") Although Hood has raised an additional rule 404(b) challenge that is likely to arise again on remand, we decline to reach that issue. The district court admitted testimony from Hood's ex-wife that Hood "at least once had sex with her while she was asleep, despite her verbal protests upon waking." The district court rejected the State's argument that this testimony was admissible based on the "doctrine of chances," but it did admit the evidence to prove Hood's intent and the victim's lack of consent. On appeal, the State asked us to affirm the admission of the ex-wife's testimony based on the doctrine of chances even though the district court expressly rejected that theory. The State contends that "the doctrine-of-chances rationale for proving lack of consent is not an alternative theory at all, because the cases holding that prior acts are admissible to prove lack of consent are, in fact, grounded in the doctrine of chances." In support of its position, the State relies on Utah Supreme Court decisions issued after the

(continued…)

ANALYSIS

¶19    At trial, Hood argued that evidence regarding his excommunication was inadmissible under rule 404(b) of the Utah Rules of Evidence. Under that rule, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). However, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* R. 404(b)(2). In other words, evidence "is not admissible to prove that a defendant has a propensity for bad behavior and has acted in conformity with his dubious character," but may be admissible "if it is offered for a proper, noncharacter purpose." *State v. Burke*, 2011 UT App 168, ¶ 29, 256 P.3d 1102.

¶20    As our supreme court has recognized, the difficulty in applying rule 404(b) "springs from the fact that evidence of prior bad acts often will yield dual inferences—and thus betray both a permissible purpose and an improper one." *State v. Verde*, 2012 UT 60, ¶ 16, 296 P.3d 673, *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. On one hand, exposing the

---

(…continued)

district court's ruling in this case. *See generally State v. Lopez*, 2018 UT 5, ¶¶ 48–64, 417 P.3d 116; *State v. Lowther*, 2017 UT 34, ¶¶ 24–27, 398 P.3d 1032. By not reaching this issue, we leave the district court free on remand to reconsider the admissibility of this evidence in light of recent case law. *See Blackmore v. L & D Dev. Inc.*, 2016 UT App 198, ¶ 30, 382 P.3d 655 (noting that "on remand from an appeal, the district court retains discretion to decide whether to reconsider any issue which was not expressly or impliedly disposed of on appeal" (quotation simplified)).

jury to evidence of a defendant's acts of misconduct may lead to an impermissible inference "that the defendant has a reprehensible character, that he probably acted in conformity with it, and that he should be punished for his immoral character in any event." *Id.* ¶ 29. "On the other hand, the rule also recognizes that acts of prior misconduct may also sustain an alternative—and entirely permissible—inference." *Thornton*, 2017 UT 9, ¶ 36. When offered for a non-propensity purpose, "such evidence is admissible so long as it satisfies rules 402 and 403." *Id.* (quotation simplified).

## I. Applicability of Rule 404(b)

¶21 Before analyzing whether these requirements were met, we first address the State's alternative argument that the evidence at issue is not subject to rule 404(b). The State contends that evidence of Hood's excommunication does not fall within rule 404(b) for three reasons: (1) excommunication is not "a crime, wrong, or other act," (2) Hood's statements about his excommunication were not offered to prove that they were true but only that they had been made, and (3) telling W.B. that he had been excommunicated was intrinsic to the crimes with which he was charged and not subject to rule 404(b). Although none of these arguments were made to the district court, an appellate court may affirm "on any legal ground or theory apparent on the record," even if such ground or theory "was not raised in the lower court, and was not considered or passed on by the lower court." *Goodsel v. Department of Bus. Regulation*, 523 P.2d 1230, 1232 (Utah 1974) (quotation simplified). But, for the reasons set forth below, we do not find these alternative arguments persuasive.

### A. Other Act Evidence

¶22 First, the State claims that excommunication does not fall within rule 404(b) because it "represents a person's standing in

the [church], not an act performed by the defendant." We agree with the State that a person's status as an excommunicated member of the church does not necessarily imply the commission of a bad act. But in the unique context of this case, evidence of excommunication strongly implied that Hood had committed an act relevant to his propensity to commit the crimes for which he was on trial.

¶23 According to an official church publication cited by both parties, a disciplinary council "must be held in cases of murder, incest, or apostasy," "when a prominent Church leader commits a serious transgression, when the transgressor is a predator who may be a threat to other persons, when the person shows a pattern of repeated serious transgressions, when a serious transgression is widely known, and when the transgressor is guilty of serious deceptive practices and false representations or other terms of fraud or dishonesty in business transactions." Elder M. Russell Ballard, *A Chance to Start Over*, Ensign (September 1990), www.lds.org/ensign/1990/09/a-chance-to-start-over-church-disciplinary-councils-and-the-restoration-of-blessings?lang=eng [https://perma.cc/GVL7-8PWE]. Disciplinary councils may also be convened "following serious transgression such as abortion, transsexual operation, attempted murder, rape, forcible sexual abuse, intentionally inflicting serious physical injuries on others, adultery, fornication, homosexual relations, child abuse (sexual or physical), spouse abuse, deliberate abandonment of family responsibilities, robbery, burglary, embezzlement, theft, sale of illegal drugs, fraud, perjury, or false swearing." *Id.*

¶24 The State correctly points out that "excommunication may result from other acts which, to many or most people, do not reflect poorly on a person's character." For instance, excommunication based on theological disagreements, or "apostasy," would not imply the commission of "a crime, wrong, or other act" within the meaning of rule 404(b). But the

vast majority of "transgressions" that lead to excommunication in the church are "serious criminal offenses," including sexual abuse. *See Church Discipline*, The Church of Jesus Christ of Latter-day Saints Newsroom, www.mormonnewsroom.org/article/church-discipline [https://perma.cc/J8XZ-WW84]. Here, the jury was left to speculate about the "transgression" Hood had committed. And the only evidence presented suggested that the act resulting in Hood's excommunication was similar in kind to the charged conduct.

¶25   Hood was on trial for rape and forcible sodomy. The only testimony regarding potential reasons for excommunication referred to "morality," and was given by his ex-wife who also testified that Hood had raped her three years earlier. Testimony that Hood was actively seeking to rejoin the church also dispelled any suggestion that his excommunication was based on theological disagreements with church doctrine. To a Utah jury likely to be familiar with the type of conduct that would trigger church discipline,[6] the implication was that Hood had been excommunicated for an act similar in kind to the sexual abuse alleged by both his ex-wife and W.B. Where the evidence strongly implies that the defendant committed a "bad act," the proponent of that evidence cannot avoid the application of rule 404(b) by stopping short of identifying the act.

¶26   For example, evidence that a defendant was fired from his last job might not suggest that he committed a bad act, given the various reasons why an employee might be terminated. But if that employee were on trial for sexually harassing a co-worker

---

6. A majority of Utahns are members of The Church of Jesus Christ of Latter-day Saints. *See* Pew Research Center, *Religious Landscape Study*, http://www.pewforum.org/religious-landscape-study/state/utah/ [https://perma.cc/W9L3-R2ZK].

*and* the jury is told multiple times that he was fired from his prior job *and* the only evidence presented regarding grounds for termination is "inappropriate behavior" in the workplace *and* the witness who provides that evidence has accused defendant of sexual harassment in the past, evidence that the defendant was fired strongly suggests that the termination resulted from similar conduct. Indeed, the likely (and perhaps only) inference a jury will draw is that the defendant committed a prior act that bears on his propensity to engage in the type of conduct for which he is on trial.

¶27    In other contexts, we have held that a person's status can imply the commission of other acts, even when the State does not introduce evidence of the acts themselves. For instance, we have applied rule 404(b) to evidence of a defendant's parole status, even when the State introduces no evidence of the prior crime. *See State v. Fairchild*, 2016 UT App 205, ¶ 18, 385 P.3d 696; *State v. Dominguez*, 2003 UT App 158, ¶¶ 16, 21, 72 P.3d 127. Similarly, we have held that rule 404(b) applies to gang membership where that affiliation implicates the defendant in unlawful gang activity. *See State v. Gonzalez*, 2015 UT 10, ¶ 38, 345 P.3d 1168; *see also State v. High*, 2012 UT App 180, ¶ 19, 282 P.3d 1046 (noting that "a number of jurisdictions that have considered the matter have concluded that membership in a gang does constitute evidence of other crimes, wrongs, or acts governed by rule 404(b)"). Other courts have similarly applied rule 404(b) to evidence of a defendant's status as a probationer or registered sex offender, even though the underlying crime that resulted in that status was not disclosed. *See, e.g.*, *State v. Derbyshire*, 2009 MT 27, ¶ 23–24, 201 P.3d 811 (applying rule 404(b) to evidence of defendant's status as a probationer); *State v. Terrovona*, 716 P.2d 295, 304–05 (Wash. 1986) (en banc) (same); *Coppock v. State*, No. 05-13-00907-CR, 2015 WL 1811871, at *5 (Tex. Ct. App. April 20, 2015) (applying rule 404(b) to evidence of defendant's sex offender status). The State cannot avoid rule

404(b) by simply not identifying the underlying act that resulted in that status.

¶28 In the cases cited above, the defendant's status necessarily implies a criminal conviction. But rule 404(b) is not limited to other "crimes," but instead applies more generally to "wrongs" and "other acts" that "may bear adversely on the jury's judgment of the character of a person." 29 Am. Jur. 2d *Evidence* § 413 (2018).[7] For example, other courts have treated disciplinary proceedings or resulting sanctions as subject to rule 404(b). *See, e.g.*, *United States v. Vogel*, 132 F. App'x 119, 120 (9th Cir. 2005) (defendant's disbarment from legal practice); *United States v. Sandow*, 78 F.3d 388, 390–91 (8th Cir. 1996) (suspension of defendant's agent/broker license); *United States v. Cunningham*, 103 F.3d 553, 556–77 (7th Cir. 1996) (suspension of defendant's nursing license); *United States v. Fox*, 69 F.3d 15, 19 (5th Cir. 1995) (disciplinary action and suspension of defendant's real estate license). Even when the reasons for disciplinary action are not revealed, such evidence implies not only that the defendant allegedly engaged in some type of misconduct, but that a

---

7. The phrase "other acts" in rule 404(b) could arguably include "any conduct, good or bad, that tends to reflect on the person's character." *See* Charles Alan Wright & Arthur R. Miller, 22B Federal Practice & Procedure Evidence § 5245 (2d ed. 1987). Alternatively, "other acts" can be "read along with the first two categories so it only covers conduct that resembles crimes or wrongs." *Id*. Because an act that results in excommunication is most often similar in nature to a "crime" or "wrong," which includes the "violation of religious and ethical norms," *id.*, we do not reach the question of whether "other acts" might also include specific incidents of behavior that bear on the defendant's character but do not amount to misconduct.

disciplinary body found those allegations to be substantiated and worthy of censure.

¶29 Evidence that the church initiated disciplinary proceedings against Hood and that the disciplinary body concluded that excommunication, the church's most severe sanction, was warranted similarly suggests that Hood engaged in misconduct that reflects poorly on his character. To be clear, we do not suggest that excommunication would always qualify as "other act" evidence subject to rule 404(b). In other contexts, ecclesiastical censure may carry no implication that the defendant committed an act that reflects adversely on his character, such as where the evidence suggests that the censure resulted from theological differences. But, under the unique circumstances of this case, the evidence of Hood's excommunication strongly implied that Hood had committed "a crime, wrong, or other act" within the meaning of rule 404(b).

B.     Truth of the Matter Asserted

¶30     Second, the State argues that Hood's statements regarding his excommunication were not offered to prove the truth of the matter asserted, but were "instead 'offered simply to prove that they were made by the defendant.'"[8] (Quoting *Oman v. Davis School Dist.*, 2008 UT 70, ¶ 59, 194 P.3d 956.) Whether an out-of-court statement is admitted to establish the truth of the matter asserted is relevant to determining whether the evidence is hearsay. *See* Utah R. Evid. 801(c)(2) ("'Hearsay' means a statement that . . . a party offers in evidence to prove the truth of

---

8. Although the State claims that it "did not suggest that [Hood's] statements about his excommunication were true," it assumed the truth of Hood's status in the church during his cross-examination, when it prefaced a question by stating that Hood had been "officially excommunicated from the church."

the matter asserted in the statement."). But Hood has not raised a hearsay objection. The hearsay rules and rule 404(b) are separate evidentiary hurdles. In other words, out-of-court statements admissible as non-hearsay may still be inadmissible under rule 404(b). *See State v. Webster*, 2001 UT App 238, ¶ 31 n.9, 32 P.3d 976 (recognizing that the defendant's statement was non-hearsay, but, as with all other evidence, "the statement [was] still subject to the requirements of Rule 404(b)"). The State's position may be relevant to whether the evidence was offered for a proper purpose, but the evidence is still subject to a 404(b) analysis.

C.     Inextricably Intertwined

¶31     Third, the State argues that Hood's statements about his excommunication were intrinsic to the crime. Rule 404(b) "applies only to evidence that is extrinsic to the crime charged." *See State v. Lucero*, 2014 UT 15, ¶ 14 n.7, 328 P.3d 841 (quotation simplified), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. If the challenged evidence is "inextricably intertwined" with the crime charged, rule 404(b) does not apply. *Id.* (quotation simplified) "Rather, the act would be considered part of the case narrative and have important probative value that bears directly on the crime charged." *Id.*

¶32     Evidence of Hood's excommunication was not so "inextricably intertwined" with the charged crimes that it falls outside the scope of rule 404(b). Although Hood's excommunication and professed desire to return to the church may have provided the jury with insight into the couple's relationship, it was not an integral part of the charged conduct: rape and forcible sodomy. There is no evidence to suggest that Hood told W.B. that he had been excommunicated for the purpose of coercing or intimidating her into submitting to the charged conduct. *See State v. Patten*, 2018 VT 98, ¶ 10 (affirming the district court's determination that defendant's statement to

victim that he was a sex offender, made immediately before their first sexual contact, "was 'part and parcel' with the sexual contact" and "relevant to complainant's 'level of intimidation and cooperation/consent.'"). In describing the alleged rape and sodomy, W.B. never referred to Hood's excommunication or suggested that it facilitated or otherwise played a role in the commission of those offenses. At most, the evidence explained why W.B. maintained her troubled relationship with Hood and was present in his home during the alleged offense.

¶33 Establishing some minimal relevance to the State's narrative is insufficient to place other-act evidence beyond the reach of rule 404(b). If it were otherwise, application of rule 402 would be the first and last step of the analysis. Because evidence of Hood's excommunication was not so closely connected to the charged crimes to be intrinsic, rule 404(b) applies to this other-act evidence.

## II. Application of Rule 404(b)

¶34 Having determined that rule 404(b) applies, we turn to whether admission of the evidence exceeded the district court's discretion. Evidence of a defendant's prior misconduct "must clear several evidentiary hurdles before admission—rules 404(b), 402, and 403." *State v. Reece*, 2015 UT 45, ¶ 57, 349 P.3d 712 (quotation simplified). "These requirements can be distilled into a three-part test: the prior bad-act evidence (1) must be offered for a genuine, noncharacter purpose, (2) must be relevant to that noncharacter purpose, and (3) the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice." *Id.* (quotation simplified).

¶35 Here, the district court did not conduct this three-part analysis on the record. Under prior case law requiring a "scrupulous examination" of rule 404(b) evidence, failure to do so would have been an independent basis for reversal.

*See State v. Lucero*, 2014 UT 15, ¶ 37, 328 P.3d 841, *abrogated by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. But the Utah Supreme Court recently repudiated the "scrupulous examination" standard. *Thornton*, 2017 UT 9, ¶ 3. Rather than assessing the "scrupulousness" of the district court's analysis, we "simply assess whether the district judge made an error *in admitting or excluding the evidence in question.*" *Id.* ¶ 53. "Said another way, we no longer focus on the path the [district] court followed in reaching its conclusion, but review only the conclusion itself." *State v. Von Niederhausern*, 2018 UT App 149, ¶ 14, 427 P.3d 1277. Of course, a judge who engages in such a "scrupulous examination" of 404(b) evidence—"marching through the standards set forth in rules 404(b), 402, and 403, and presenting his analysis on the record"—"will be better-positioned to have his decision on admissibility of prior misconduct evidence affirmed on appeal." *Thornton*, 2017 UT 9, ¶ 54.

¶36 Although we do not have the benefit of the district court's analysis on the record, we apply the three-part test below to determine whether the district court's ultimate decision to admit evidence of Hood's excommunication constituted an abuse of discretion. We conclude that the evidence clears the first two evidentiary hurdles, but not the third.

A. Non-Character Purpose Under Rule 404(b)

¶37 "The threshold 404(b) question is whether the evidence has a plausible, avowed purpose beyond the propensity purpose that the rule deems improper." *State v. Thornton*, 2017 UT 9, ¶ 58, 391 P.3d 1016 (emphasis omitted). If "the proper purpose put forward by the prosecution is addressed to an issue that is not actually disputed," and "the only real effect of the evidence is to suggest likely action in conformity with bad character," the avowed purpose "may be rejected as a pretext or ruse." *Id.* ¶ 59 (quotation simplified). "Short of that, however, the court's job

under rule 404(b) is not to balance or weigh competing (proper and improper) inferences." *Id.*

¶38 At trial, the State argued that "it would be very difficult for [W.B.] to tell the story of their relationship" without discussing the excommunication because Hood's "plea for help, spiritually speaking, was one of her reasons for staying in contact with him." In overruling Hood's rule 404(b) objection, the court found that Hood's excommunication was "a fairly central part of the ongoing relationship of these parties."

¶39 Our supreme court has upheld the admission of rule 404(b) evidence presented for a similar purpose. In *Thornton*, the State presented "evidence of Thornton's involvement in [the victim's] mother's drug use and prostitution." *Id.* ¶ 57. The court concluded that the prior misconduct evidence "presented a narrative of relevance to the prosecution's case—to demonstrating Thornton's position of power in the home, to explaining why he had such easy access to [the victim], and to suggesting why [the victim] may have waited to come forward with accusations against Thornton." *Id.* Consequently, our supreme court held that "the district court acted within its discretion in crediting this proper purpose." *Id.*

¶40 Much like *Thornton*, the avowed purpose of the State's excommunication evidence was to explain the dynamics of the relationship between Hood and W.B. The State claimed that Hood's statements to W.B. about his excommunication and his desire to return to "full fellowship" in the church motivated W.B. to continue the relationship. According to the State, this explained why W.B. returned to Hood's apartment even though his sexual advances were unwelcome, providing him with the opportunity to commit the charged crimes. This narrative was essential to the State's theory of the case that Hood had taken advantage of a "religious" and "naïve" woman who was invested in his spiritual well-being. As the State points out, this

narrative does not depend on whether Hood was truly excommunicated; rather, the proffered purpose for admitting evidence of Hood's alleged status as a repentant excommunicant was to show its effect on W.B.

¶41    At this stage in the analysis, we do not weigh the competing inferences that a jury might draw from this evidence. Because the State has offered this evidence for a proper, non-propensity purpose, it is presumptively admissible under rule 404(b).

B.    Relevance Under Rule 402

¶42    "The second part of the analysis requires the court to determine whether the offered evidence meets the requirements of rule 402, which excludes all evidence that is not relevant." *State v. Decorso*, 1999 UT 57, ¶ 22, 993 P.2d 837, *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. "Relevance is a low bar." *Thornton*, 2017 UT 9, ¶ 61. Evidence is relevant if "it has any tendency to make a fact [of consequence in determining the action] more or less probable than it would be without the evidence." Utah R. Evid. 401(a). Under rule 402, relevant evidence is presumptively admissible. *Id.* R. 402.

¶43    According to the State, W.B.'s desire to help Hood return to the church explained how Hood "persuaded [her] to continue the relationship, and why she would keep seeing him when he persisted in his efforts to have a sexual relationship against her religious beliefs." Understanding the dynamics of the relationship would help the jury assess the respective credibility of Hood and W.B. and whether the alleged sexual acts occurred without her consent. These were the key issues at trial. Because there was no dispute that the sexual acts occurred, the jury was tasked only with determining whether those acts were consensual. And because there were no other witnesses, that determination turned on its assessment of Hood's and W.B.'s

credibility. Accordingly, this evidence was relevant and thus presumptively admissible under rule 402.

## C. Balancing Under Rule 403

¶44 The third step in assessing the admissibility of other-act evidence requires us "to look first, and primarily, to the language of rule 403." *State v. Ring*, 2018 UT 19, ¶ 23, 424 P.3d 845. Under that language, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Utah R. Evid. 403. "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

¶45 The balancing required by rule 403 "is essential to preserve the integrity of rule 404(b)." *State v. Verde*, 2012 UT 60, ¶ 18, 296 P.3d 673, *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. If the evidence admitted under rule 404(b) supports proper and improper inferences, "the court should balance the two against each other under rule 403, excluding the bad acts evidence if its tendency to sustain a proper inference is outweighed by its propensity for an improper inference or for jury confusion about its real purpose." *Id.*

¶46 To assess the risk of unfair prejudice, we first consider the types of impermissible inferences a jury could reasonably draw from the evidence. While the exact reasons for Hood's excommunication were not disclosed, his ex-wife testified that there are certain acts involving "morality" that can trigger a church disciplinary council and lead to excommunication. At the

very least, this testimony suggested that Hood had previously been adjudicated guilty of some act deemed immoral by a church disciplinary council. And W.B.'s testimony that her "punishment" for premarital sex was counseling by her local bishop to refrain from taking the sacrament for three weeks further suggested that a much more egregious act of immorality would lead to formal disciplinary proceedings and excommunication, the church's harshest penalty.

¶47 The nature of the charges against Hood exacerbates the potential for prejudice. Disciplinary councils are convened when a member has engaged in "serious criminal offenses" or "sexual sin," including any type of "sexual abuse." *See Church Discipline*, The Church of Jesus Christ of Latter-day Saints Newsroom, www.mormonnewsroom.org/article/church-discipline [https://perma.cc/WS75-ERP8]. To a Utah jury serving as fact-finders in a rape and forcible sodomy trial, the evidence of Hood's prior excommunication could imply that he might have engaged in similar conduct in the past.

¶48 At a minimum, the evidence suggested that Hood was the type of person who would disregard church doctrine. This alleged character trait carried special significance in light of the State's theory at trial. To prove that the sexual acts were nonconsensual, the State relied heavily on W.B.'s religious convictions and Hood's alleged refusal to honor her commitment to the "law of chastity." Given this context, admission of the excommunication evidence created a significant risk that it would be considered for the improper purpose of showing that commission of the alleged crimes was in conformity with Hood's character.

¶49 With those impermissible character inferences in mind, we turn to whether the risk of unfair prejudice substantially outweighed the probative value of the evidence. In making this assessment, we are "free to consider any relevant factors when

balancing the probative value of evidence against its risk for unfair prejudice." *State v. Lowther*, 2017 UT 34, ¶ 42, 398 P.3d 1032. Of particular relevance here is the State's "need for the evidence" and "efficacy of alternative proof." *Id.* ¶ 33 (quotation simplified).

¶50    In balancing the risk of unfair prejudice against the probative value of the evidence, it is appropriate to consider the availability of other, less prejudicial, means of proof. As the United States Supreme Court has recognized, "what counts as the Rule 403 'probative value' of an item of evidence, as distinct from its Rule 401 'relevance,' may be calculated by comparing evidentiary alternatives." *Old Chief v. United States*, 519 U.S. 172, 184 (1997). "If an evidentiary alternative has equal or greater probative value and poses a lower risk of unfair prejudice, the trial court should 'discount' the probative value of the disputed evidence and exclude it if the risk of unfair prejudice substantially outweighs its discounted probative value." *See United States v. Becht*, 267 F.3d 767, 773 (8th Cir. 2001).

¶51    Here, Hood informed the court that he had no objection to evidence that he was a former member seeking to rejoin the church. There is no "cognizable difference" between Hood's proposed evidence and the "legitimately probative component" of the excommunication evidence.[9] *Old Chief*, 519 U.S. at 191. The legitimate probative value of the excommunication evidence went to enhancing the credibility of W.B.'s testimony that the

---

9. In rejecting this alternative proposal, the district court questioned whether it would be possible to "shape or mold [W.B.'s] testimony beyond what the facts actually are." As with all pre-trial rulings, the parties would have complied by instructing their witnesses to avoid the prohibited topic and by carefully tailoring their examination questions or seeking permission to proceed by leading questions, if necessary.

sexual acts were nonconsensual by explaining that she maintained her relationship with Hood, despite their disparate views on premarital sex, because Hood had asked her to help him return to "full fellowship" with the church. Allowing Hood's proposed evidence that he was a former church member, while excluding testimony that his status resulted from excommunication, would leave no gaps in the natural sequence of events or otherwise diminish the "evidentiary depth" of the State's narrative. *See id.* at 189–90. Disclosing the excommunication itself added nothing to the legitimate probative value of the evidence. *See State v. Verde*, 2012 UT 60, ¶ 30 (holding that, although the state was free to reject a proposed stipulation, its rejection had "probative implications" and reinforced "the conclusion that the prosecution's purpose was not to tell a legitimate narrative to the jury but instead to present an improper one"), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. The only thing to be gained was an increased risk that the jury would draw impermissible inferences about Hood's character.

¶52    The State's avowed purpose for using the evidence would have been equally well served by admitting evidence of Hood's estrangement from and renewed interest in the church while still granting his 404(b) motion to exclude his excommunication. The additional probative value of the excommunication evidence, if any, was substantially outweighed by the danger of unfair prejudice. Given the facts of this case, the district court's decision to admit evidence of Hood's excommunication exceeded the bounds of reasonableness and constitutes an abuse of discretion.

### III. Harmfulness

¶53    Finally, we consider whether this evidentiary error necessitates reversal. "Even if the admission of rule 404(b) evidence by the [district] court was in error, reversal on appeal is not appropriate unless [the defendant] demonstrates that the

error materially affected the fairness or outcome of the trial." *State v. Calvert*, 2017 UT App 212, ¶ 38, 407 P.3d 1098 (quotation simplified). We will overturn a conviction based on the improper admission of evidence only if a "reasonable likelihood exists that the error affected the outcome of the proceedings." *Id.* (quotation simplified).

¶54 In determining whether the erroneous admission of other-act evidence was harmless, we often look to the strength of the evidence supporting the jury's verdict. *See State v. Courtney*, 2017 UT App 172, ¶ 22, 424 P.3d 198; *State v. Ferguson*, 2011 UT App 77, ¶ 19, 250 P.3d 89. But this is not a case where the evidence of guilt was overwhelming. As is typical with allegations of sexual abuse, the alleged perpetrator and victim were the only witnesses to the charged conduct. The verdict hinged entirely on the jury's assessment of their relative credibility. Since there was no dispute that the acts occurred, the jury was specifically charged with deciding whether to believe Hood's account that the acts were consensual or W.B.'s account that they were not. That was not an easy task, given the evidence that the couple had an ongoing romantic relationship and had engaged in at least some consensual sexual activity in the past. To aid the jury in its credibility assessment, the State made a concerted effort to contrast W.B.'s character—particularly, her religious character—with Hood's. As a result, Hood's excommunication took on particular significance at trial. His excommunication and what it implied about his moral character was central to the State's theory of the case.

¶55 When viewed in light of the entire record, the erroneous admission of other-act evidence was not inconsequential. The reference to Hood's excommunication was not isolated. Instead, the State elicited evidence about Hood's excommunication from three separate witnesses and referred to it again to support its narrative during closing argument. Moreover, references to church doctrine and, by implication, Hood and W.B.'s

comparative morality, were pervasive throughout trial. For example, W.B. testified about her interaction with the church missionaries, discussions with her bishop, her attendance at church services, priesthood blessings, the "law of chastity" and other church teachings, the founding of the church and "restoration of the . . . keys of the priesthood," and her religious convictions generally. In contrast, the State painted Hood as lacking any sincere religious convictions. At one point, the prosecutor even questioned whether Hood had made a "real attempt . . . to hear the Gospel again, the Gospel of Jesus Christ, the Church of Jesus Christ of Latter-day Saints."

¶56    In short, we agree with Hood that "the entire trial devolved into an exploration of [his] perceived religious failings." The evidence suggested that W.B. was the type of person who would refuse consent based on her religious convictions and that Hood was the type of person who would disregard such objections. We are not suggesting that the State's strategy was necessarily improper, only that it exacerbated the potential prejudice from the improper admission of Hood's excommunication. In the context of this case, evidence that a disciplinary body had previously found Hood guilty of a sufficiently serious moral transgression that warranted expulsion from his faith may have suggested that he had an immoral character and the propensity to commit the crimes charged. In a case that turned on conflicting testimony regarding consent, there is a reasonable probability that such propensity evidence unfairly influenced the jury's verdict.

CONCLUSION

¶57    The probative value of Hood's excommunication was substantially outweighed by the risk of unfair prejudice. Because there is a reasonable probability the erroneous admission of this

evidence affected the outcome of the trial, we vacate his convictions and remand for a new trial.

_____

CHRISTIANSEN FORSTER, Judge (concurring in part and concurring in result):

¶58    I concur in Part II.C and Part III of the majority opinion and concur in the result reached in this case. While I disagree that the evidence of Hood's excommunication constitutes "other act" evidence pursuant to rule 404(b) of the Utah Rules of Evidence, I agree with the majority that there is a reasonable probability that the introduction of the excommunication evidence prejudiced Hood.

_____