*This opinion is subject to revision before final publication in the Pacific Reporter*

**2024 UT 25**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

DOUGLAS A. LOVELL,
*Appellant.*

No. 20150632
Heard February 9, 2024
Filed July 25, 2024

On Direct Appeal

Second District, Weber County
The Honorable Michael D. DiReda
No. 921900407

Attorneys:

Sean D. Reyes, Att'y Gen., Mark C. Field, William M. Hains,
Asst. Solics. Gen., Salt Lake City, for appellee

Colleen K. Coebergh, Salt Lake City, for appellant

ASSOCIATE CHIEF JUSTICE PEARCE authored the opinion of the
Court, in which JUSTICE PETERSEN, JUSTICE HAGEN, JUDGE JOHNSON,
and JUDGE KELLY joined.

Having recused themselves, CHIEF JUSTICE DURRANT and
JUSTICE POHLMAN do not participate herein; DISTRICT COURT
JUDGES CHRISTINE S. JOHNSON and KEITH A. KELLY sat.

ASSOCIATE CHIEF JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1 Douglas Lovell appeals his 2015 conviction and death
sentence for the murder of Joyce Yost. Lovell first argues that his

conviction should be overturned because the district court improperly admitted testimony he provided in connection with his now-vacated 1993 guilty plea. Even if we assume that this testimony should not have been admitted, its admission did not prejudice Lovell in light of the overwhelming evidence of his guilt. We affirm Lovell's conviction.

¶2    Lovell also argues that, even if his conviction is not overturned, he is entitled to a new sentencing proceeding. He contends that his counsel was constitutionally deficient in various ways. We agree that Lovell did not receive the representation the United States Constitution guarantees him. Lovell's two attorneys provided ineffective assistance when they failed to object to, among other things, testimony regarding Lovell's excommunication from the Church of Jesus Christ of Latter-day Saints (the Church). This prejudiced Lovell's ability to have a fair sentencing hearing. Lovell is entitled to a sentencing hearing free from this improper and prejudicial evidence. We therefore vacate Lovell's sentence and remand for further proceedings.

**BACKGROUND**

¶3    In 1985, Lovell kidnapped Joyce Yost and raped her. *See State v. Lovell* (*Lovell I*), 1999 UT 40, ¶¶ 3–8, 984 P.2d 382. Yost reported these crimes to the police. *Id.* Lovell then attempted to hire two individuals to kill Yost to prevent her from testifying against him. *Id.* ¶¶ 4–5. After those attempts failed, Lovell kidnapped Yost and killed her in a canyon outside of Ogden. *Id.* ¶¶ 6–7.

¶4    Eight years later, Lovell pled guilty to the aggravated murder of Yost and was sentenced to death. *Id.* ¶ 2. After he was sentenced, Lovell moved to withdraw his guilty plea. *State v. Lovell* (*Lovell II*), 2005 UT 31, ¶¶ 4, 12, 114 P.3d 575. The district court dismissed the motion to withdraw, concluding that it lacked jurisdiction to consider the merits of Lovell's motion. *Id.* ¶ 12. Lovell appealed. We reversed the district court's determination and remanded for the district court to conduct a hearing on the merits of Lovell's motion to dismiss. *Id.* ¶ 29.

¶5    On remand, Lovell argued that good cause existed to withdraw his plea "because the trial court failed to strictly comply with Utah Rule of Criminal Procedure 11(e)." *State v. Lovell* (*Lovell III*), 2011 UT 36, ¶ 3, 262 P.3d 803, *abrogated on other grounds by State v. Guard*, 2015 UT 96, ¶¶ 52, 61, 371 P.3d 1. Lovell contended that the district court erred because it failed to inform him of the rights

he would be waiving by pleading guilty. *Id.* Lovell also argued that the court erred because it did not inform him of his right to appeal or the time limit to withdraw his plea. *Id.* Lovell further contended that the district court "did not properly determine what plea agreement was reached by . . . Lovell and the State." *Id.* The district court did not permit Lovell to withdraw his plea. *Id.* ¶ 4. Lovell appealed again, and we reversed, holding that the district court failed to comply with rule 11(e). *Id.* ¶ 80. We concluded that this failure presented good cause for Lovell to withdraw his plea. *Id.*

¶6 With his plea withdrawn, Lovell's case proceeded to trial. In this trial, Lovell did not plead guilty, but neither did he contest his guilt, telling the jury during opening statements that he "is in fact guilty." As part of the guilt phase of Lovell's trial, the State presented the jury with evidence of Lovell's crimes. The State introduced surreptitious recordings of Lovell that it obtained while he was in prison. In those recordings, Lovell admitted that he murdered Yost.

¶7 Rhonda Buttars, Lovell's former spouse, testified that Lovell had told her that Yost had accused him of rape and that he wanted to kill Yost to prevent her from testifying against him. Buttars also testified that Lovell attempted to hire two people to murder Yost before ultimately killing her himself.

¶8 The State introduced Yost's testimony from the preliminary hearing on Lovell's rape charges. Yost testified that Lovell had raped her twice. The State offered Tom Peters's testimony from Lovell's 1993 sentencing. Peters was one of the men Lovell had tried to hire to kill Yost. Peters explained that Lovell told him Yost "was trying to accuse him of raping her . . . and that something had to be done."

¶9 The State also introduced transcripts of Lovell's testimony following his 1993 guilty plea. During that testimony, Lovell confessed to kidnapping, sexually assaulting, and murdering Yost to keep her from testifying against him.

¶10 Lovell did not cross-examine any of the State's witnesses at trial, although the transcript of Yost's prior testimony contained cross-examination. The jury convicted Lovell of aggravated murder.

¶11 After establishing Lovell's guilt, his trial entered the penalty phase.[1] There, the State presented additional evidence to support its burden of demonstrating that death was the appropriate punishment for Lovell's crimes.[2]

¶12 The State first presented victim-impact testimony from Yost's son, daughter, and two granddaughters. They testified about the effect Yost's murder had on them and their family.

¶13 The State presented testimony from two law enforcement witnesses who investigated Yost's death. The State also called Kim Holden, an adult probation and parole officer. These witnesses testified about Lovell's lengthy criminal history and opined that he was untruthful, manipulative, and self-centered. Holden told the jury that if Lovell's sentence held open the possibility of parole, the parole board would "have the authority to release [him] immediately."

¶14 Carl Jacobson—a correctional supervisor at the prison— testified that, in his opinion, Lovell is manipulative, cold, calculating, and controlling. Jacobson also opined that Lovell was an escape risk.

¶15 Lovell then presented his case for mitigation. Lovell's theme was that he was a changed person who had shown remorse and accepted responsibility for his crimes.

¶16 Lovell began his argument by presenting testimony from three of his former ecclesiastical leaders. Each witness described Lovell as very remorseful, a model prisoner, a hard worker, and a

---

[1] Pursuant to Utah Code section 76-3-207(1), Lovell's trial was split into a guilt phase, where the jury determined whether Lovell was guilty of the crime, and a penalty phase, where the jury considered whether the death penalty should be imposed.

[2] We note that because Lovell committed the murder before April 27, 1992, but was sentenced after that date, Utah law allowed Lovell "to proceed either under the law which was in effect at the time the offense was committed or under the additional sentencing option of life in prison without parole." UTAH CODE § 76-3-207.5(2). The punishments available to Lovell when he committed his crime were life in prison with the opportunity of parole or death. *See id.* § 76-3-207.5(1)(b). Lovell elected to proceed under the old law, removing life without parole as a possible sentence.

caring individual. They testified that he was continually trying to improve himself and that he was involved with several charitable organizations.

¶17   Dr. John Newton was the first to testify. Newton testified that Lovell had expressed remorse for his crimes "[m]any times" during their interactions and that he believed Lovell "was very remorseful." Newton explained that Lovell had "turned down an opportunity to have the details of his case aired because he was concerned that . . . it would affect the victim's family." Newton also testified that based on conversations he had with the officers in the prison, he "think[s] [Lovell] was regarded as a model prisoner." And he testified that Lovell "was involved with two or three charitable organizations."

¶18   On direct examination, Lovell did not elicit any testimony about Newton's religious affiliation. Indeed, it appears that Lovell's counsel assiduously avoided asking Newton any questions about his role as a Church bishop.[3] Nor did Lovell's counsel ask Newton any questions about Lovell's religious affiliation or status. The only suggestion that Newton's interactions with Lovell involved the Church was Newton's response when counsel asked him, "what did your discussions with Mr. Lovell entail when you met with him?" Newton testified that he talked

---

[3] In the Church, "A bishop is the leader of a local congregation (known as a ward) with duties similar to those of a pastor, priest or rabbi." *Bishop*, THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS NEWSROOM, https://newsroom.churchofjesuschrist.org/article/bishop [https://perma.cc/8P7M-9CCQ].

To provide context, we will explain or define terms witnesses used that refer to Church teachings or practices. To the extent any of these might be considered adjudicative facts, we can take judicial notice of them because they are generally known in the jurisdiction where trial occurred or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. *See* UTAH R. EVID. 201(b).

with Lovell about "religion on a fairly basic level" and "things [Lovell] had read in the Bible and the Book of Mormon."[4]

¶19   The State, on the other hand, used cross-examination as an opportunity to explore both Newton's and Lovell's religious backgrounds. The State established that Newton was a Church bishop and that the Church has a handbook "that outlines the policies and procedures" for bishops to follow. The State then asked Newton whether "the handbook requires the convening of [a] disciplinary council when evidence suggests that an individual has committed murder?"[5] Lovell's counsel objected to this line of questioning for lack of foundation and was overruled. Newton then replied that he did not convene a disciplinary council to have Lovell removed from Church membership.

¶20 The prosecutor asked Newton if Lovell had been excommunicated from the Church.[6] After confirming that Lovell

---

[4] The Book of Mormon is one of the Church's books of scripture. *Book of Mormon*, ENCYC. BRITANNICA, https://www.britannica.co m/topic/Book-of-Mormon [https://perma.cc/77B6-K9VP].

[5] Church disciplinary councils are held "to consider a member's standing in the Church following serious transgression[s]." M. Russell Ballard, *A Chance to Start Over: Church Disciplinary Councils and the Restoration of Blessings*, ENSIGN, Sept. 1990, at 15. According to the Church, the purpose of a disciplinary council is "to save the soul of the transgressor, to protect the innocent, and to safeguard the Church's purity, integrity, and good name." *Id.* A "disciplinary council 'must be held in cases of murder, incest, or apostasy.'" *State v. Hood*, 2018 UT App 236, ¶ 23, 438 P.3d 54 (quoting *id.*). These councils are now referred to as "membership councils" within the Church, although they have the same function, requirements, and purpose. *See* THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, GENERAL HANDBOOK: SERVING IN THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS 297, 302–04 (2023).

[6] In the Church, excommunication refers to the "loss of Church membership." *Church Discipline*, THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS NEWSROOM, (Dec. 10, 2018), www.mormonnewsroom.org/article/church-discipline [https://perma.cc/J8XZ-WW84]. Excommunication is "[t]he most serious sanction [a] disciplinary council may prescribe," and it is "a

(continued . . .)

had been excommunicated, the State asked Newton if Lovell had been readmitted into Church membership. The State also asked Newton what the process for readmittance after excommunication entails. By this questioning, the jury heard that "the [F]irst [P]residency is the body" that determines whether a person is "remorseful and changed enough" to rejoin the Church.[7]

¶21 The State then elicited testimony from Newton that "repentance" is "the process of changing one's life," that it requires "feeling sorrow or remorse," and that it is necessary to be readmitted to Church membership after excommunication. Following this testimony, the State asked Newton what "kind of sorrow" was required to show repentance.

¶22 When Newton responded that he was confused by the State's question, the State asked Newton if he was familiar with the phrase "[g]odly sorrow."[8] Newton said he was familiar with the

---

course of last resort . . . only taken when less serious disciplinary measures are insufficient." *Id.*

[7] The First Presidency is comprised of the President of the Church and two counselors. *First Presidency*, THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS NEWSROOM, https://newsroom.churchofjesuschrist.org/topic/first-presidency?cp=hrv-hr [https://perma.cc/69CP-FZNY]. The First Presidency holds "the supreme governing power of the Church" and they "supervise the work of the entire Church in all matters of policy, organization, and administration." THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, TEACHINGS OF THE LIVING PROPHETS STUDENT MANUAL 45 (2016) (quoting Joseph Fielding Smith, *The First Presidency and the Council of the Twelve*, 69 THE IMPROVEMENT ERA 977, 978 (1966)). A basic tenet of Church doctrine instructs that members of the First Presidency "are the living oracles of God and the supreme adjudicators . . . of the law of the Church." *Id.*

[8] The Church teaches that "godly sorrow" is a principle of repentance that "leads to conversion and a change of heart," requiring "heartfelt regret and true remorse." Dieter F. Uchtdorf, *Godly Sorrow*, NEW ERA, Sept. 2019, at 32; *see also* Dieter F. Uchtdorf, *You Can Do It Now!*, ENSIGN, Nov. 2013, at 55–56. The term "godly sorrow" is taken from a New Testament passage: "For godly sorrow worketh repentance to salvation not to be repented of: but

(continued . . .)

phrase but could not define it. Newton responded affirmatively when the State asked if repentance requires "a full and complete confession." Newton also confirmed that Lovell had not told him "all of the facts related to this case." Lovell's counsel again objected, arguing that this question was outside the scope of cross-examination. The district court again overruled the objection.

¶23 Lovell next called Gary Webster, another Church bishop. On direct examination, Lovell's trial counsel asked Webster about Lovell's excommunication from the Church. Webster explained that he had been involved in Lovell's excommunication, and that he believed Lovell "understood clearly what [excommunication] meant and . . . was comfortable with it." He also testified that he was not aware if Lovell had ever asked to be readmitted to Church membership.

¶24 Lovell's counsel asked Webster, "what was your impression of [Lovell's] progress towards remorse and repentance as it pertains to the process and the church?" Webster testified that during their discussions, Lovell "was consistent in expressing remorse . . . . He never made light, never made fun, always was contrite, was concerned about the crime, the impact . . . and he was always consistent."

¶25 On cross-examination, the State elicited testimony from Webster confirming that he did not represent the Church and that he believed that "no man knows what's in another man's heart."

¶26 Lovell then called Charles Thompson, a third Church bishop. Lovell's trial counsel asked Thompson about Lovell's excommunication from the Church. Thompson testified that he knew that Lovell was excommunicated, and that Lovell never spoke to him about being readmitted. Thompson also testified that "[he] see[s] [Lovell] as a model prisoner." And he testified that every time he met with Lovell, "[Lovell] has talked about remorse, particularly for the members of the family."

¶27 On cross-examination, Thompson testified that his opinions did not represent the Church and that he "cannot read what's in [Lovell's] mind or heart."

---

the sorrow of the world worketh death." 2 *Corinthians* 7:10 (King James).

¶28 Lovell continued his mitigation case by calling Becky Douglas, the founder of one of the charities Lovell had donated to while in prison. Douglas testified that she had corresponded with Lovell for several years and that she had met with him in person on one occasion. While recounting that meeting, Douglas said that she asked Lovell if he had read the New Testament.

¶29 The State objected, arguing that "if she's going to give an exposition on the doctrinal basis of the New Testament, I think it's inappropriate." Lovell's counsel explained that Douglas would not be discussing religious doctrine. The court overruled the objection but explained that it didn't "want to get into her interpretation of scriptures and other things any more than [it] wanted to get into the church's stance on the death penalty."

¶30 The court added that it "thought there were areas that we covered with the three ecclesiastical leaders" that were "not probative at all" and "out of bounds, but no one seemed to feel that way, so I let it go."

¶31 Douglas continued her testimony, saying that when she had met with Lovell "he just felt so, so desponden[t]" and that she felt "this incredible remorse, this sadness [from Lovell] . . . that there was so much despair of what he had done."[9] She shared her belief that "by going through 30 years of prison" he has become a gentle, kind, sincere, and thoughtful man. During her testimony, Douglas explained that in her interactions with Lovell, he consistently expressed sorrow for Yost and her family. And she testified that if Lovell were ever released from prison, she "wouldn't have any hesitation to invite him into [her] home." She continued by saying she has "absolute confidence that the [Lovell] I know is the real [Lovell] now."

¶32 On cross-examination, Douglas reaffirmed her belief that Lovell had changed, saying Lovell "felt like he'd done so much evil, that he felt like he needed to do as much good as he could possibly do."

¶33 Lovell presented other mitigation witnesses, including his caseworker and an officer at the prison. The officer testified that Lovell was a good inmate and that he would often resolve disputes

---

[9] The State again objected to this testimony for relevance and was overruled.

between inmates and even guards. Lovell presented evidence that in his thirty years of imprisonment, he had only received two write-ups: one for having an unbuttoned shirt and another for having too many socks in his cell. And one of these witnesses talked about an instance where Lovell had helped a guard who had been accidentally sprayed in the eyes with insecticide. These witnesses uniformly testified that Lovell was polite, respectful, and took responsibility for his actions.

¶34 Lovell's relatives testified that he was kind, humble, and positive. They also testified that, in their opinion, he would not be a risk if released and that they would support him if he were paroled. Lovell also read to the jury letters from seven of his pen-pals. These letters described Lovell as encouraging, supportive, understanding, respectful, courteous, and a good friend. They also talked about how Lovell had a positive outlook on life, he was constantly trying to improve himself, he had a lot to offer, and that he would be a beneficial addition to society if he were ever paroled.

¶35 In addition to the witnesses who testified about their personal relationships with Lovell, two expert witnesses testified in favor of mitigation. Lovell first elicited testimony from Dr. Mark Cunningham, a clinical and forensic psychologist, who testified that Lovell was not as morally culpable as other individuals. Cunningham described multiple causes of Lovell's diminished culpability, explaining that Lovell had a genetic predisposition to substance abuse and dependence, along with mood disorders and personality disturbance. Cunningham also explained that Lovell was exposed to amphetamines while his mother was pregnant. And he opined that Lovell likely suffered from a learning disability and neuropsychological deficits from recurrent head injuries.

¶36 Cunningham further testified that Lovell has diminished culpability because of his traumatic family life. He explained that Lovell had witnessed parental substance abuse and mental illness, the chronic absence of his father, and chronic dysfunction between his parents with "perverse sexuality." He also explained that Lovell was subject to the "corruptive influence of his older brothers." Cunningham testified that Lovell had inadequate family structure, supervision, and guidance, along with inadequate community interventions. Cunningham also detailed the harm Lovell suffered when his brother died. Cunningham testified that, in his opinion, there was a very low likelihood that Lovell would be violent in

prison and that there was also little risk he would be violent if he were ever paroled.

¶37 Lovell's second expert was Dr. Vickie Gregory, a neuropsychologist. Gregory testified that Lovell had sustained multiple head injuries throughout his life, at ages four, six, eleven, sixteen, and nineteen. She explained that prior tests had shown that Lovell suffered from moderate brain damage, which impaired his memory and executive functioning. Gregory also testified that she had tested Lovell, and in her opinion, he suffered from mild neurocognitive deficits due to traumatic brain injury. Gregory opined that she did not believe Lovell was a psychopath. And she testified that during her interactions with Lovell, she learned that he had completed forty-six high school and college-level classes and that he is involved in three charities.

¶38 Following the presentation of evidence, the jury retired to determine the appropriate punishment. They returned a verdict of death.

¶39 Lovell appealed, and we remanded under rule 23B of the Utah Rules of Appellate Procedure. We directed the district court to conduct an evidentiary hearing and make findings of fact concerning the representation Lovell's trial counsel provided. After conducting an evidentiary hearing, the district court issued its findings of fact related to counsel's performance. We now consider Lovell's arguments on appeal with the benefit of the 23B court's factual findings.

## ISSUES AND STANDARDS OF REVIEW

¶40 Lovell first argues that the district court erred when it admitted statements in the guilt phase of his trial that Lovell had made following his guilty plea in his earlier trial. We review a court's decision to admit evidence for abuse of discretion. *State v. Griffin*, 2016 UT 33, ¶ 14, 384 P.3d 186. But we review "the legal questions underlying the admissibility of evidence" for correctness. *Id.* (cleaned up).

¶41 Lovell next argues that his trial attorneys were constitutionally ineffective when they failed to adequately object to improper testimony during the penalty phase. An ineffective assistance of counsel claim "presents a question of law that we review for correctness." *State v. Carter*, 2023 UT 18, ¶ 25, 535 P.3d 819. When a claim for ineffective assistance of counsel has been

developed upon rule 23B remand, we defer to the 23B court's factual findings, reviewing them for clear error. *See State v. Drommond*, 2020 UT 50, ¶ 46, 469 P.3d 1056. [10]

## ANALYSIS

### I. THE ADMISSION OF LOVELL'S PRIOR TESTIMONY IN THE GUILT PHASE OF HIS TRIAL WAS HARMLESS

¶42 Lovell first contends that his conviction should be overturned because the district court improperly admitted the testimony he gave after he was convicted in 1993. Following his 1993 guilty plea, Lovell was called as a witness in the sentencing phase. Lovell first read the court a letter he wrote to plead for leniency. Lovell was then questioned under oath by both the State and his own attorneys.

---

[10] In our 23B remand order, we directed the district court "to make all findings of fact necessary to resolve: 1. Whether [trial counsel] performed deficiently" regarding multiple claims; and "2. Whether Lovell was prejudiced by [trial counsel's] deficient performance, if any." The district court not only made the factual findings we requested, but it analyzed legal arguments and entered conclusions of law.

As much as we appreciate the court's initiative, we must emphasize that rule 23B does not contemplate, or indeed permit, a district court to make legal conclusions based upon the factual findings it enters. *See* UTAH R. APP. P. 23B(a), (e). Rule 23B remands are conducted for the purpose of developing facts related to the claims of ineffective assistance, and a district court's role is limited to making these findings. *Id.* R. 23B(e). This process permits appellate counsel, armed with the facts developed on remand, to craft its appellate arguments to an appellate court.

The district court's willingness to decide legal issues on rule 23B remand is perhaps understandable given that on at least one occasion we stated that we review the 23B court's factual findings for clear error and its legal conclusions for correctness. *See State v. Drommond*, 2020 UT 50, ¶ 46, 469 P.3d 1056. This is, however, an incorrect description of the law. If a rule 23B remand hearing proceeds as the rule contemplates, there should be no legal conclusions for us to review. As much as we appreciate the district court's efforts, we disregard its legal conclusions because they are outside the scope of both rule 23B and the remand order.

¶43 During that examination, Lovell admitted to specific facts of the crime. Lovell testified that he kidnapped and sexually assaulted Yost and that he later murdered her. He described the details of the murder, how he hid Yost's body, and how he later attempted to locate her body as part of his plea agreement. He also testified about his attempt to solicit others to murder Yost. Lovell admitted that he decided to murder Yost himself after these attempts fell through. And he testified that he murdered Yost to keep her from testifying that he had raped her.

¶44 In 2011, this court vacated Lovell's guilty plea and remanded for a new trial. *Lovell III*, 2011 UT 36, ¶ 80, 262 P.3d 803. During his new trial—the trial Lovell asks us to review here— Lovell's counsel sought to suppress the admission of the testimony he provided in the sentencing phase of his previous trial. Lovell argued that this testimony arose in the context of allocution and that the admission of allocution testimony would violate his constitutional rights.[11]

¶45 The district court allowed the admission of Lovell's testimony, reasoning that it was not allocution because the statements were made under oath and subject to cross-examination.[12] The transcripts of Lovell's testimony were subsequently used to establish guilt at the trial that is the subject of this appeal.

¶46 Lovell argues that the district court erred when it determined that the testimony did not qualify as allocution. He further contends that because the testimony was obtained in connection with his vacated guilty plea, its admission violated his "right to appear and defend in person" under article I, section 12 of the Utah Constitution.

---

[11] "Allocution is a defendant's right to speak on his or her own behalf after the fact finder determines guilt but before the judge pronounces sentence." 24 C.J.S. *Criminal Procedure and Rights of the Accused* § 2255 (2024). "It is designed to temper punishment with mercy in appropriate cases, and to ensure that sentencing reflects individualized circumstances." 21 AM. JUR. 2D *Criminal Law* § 723 (2024).

[12] The district court concluded that the letter Lovell read into the record should be considered allocution and excluded it.

¶47 Lovell points to our decision in *State v. Maestas* and argues that we concluded there that the constitutional right to allocution prevents using allocution statements in a subsequent prosecution. *See* 2002 UT 123, ¶¶ 3, 48–49, 140, 63 P.3d 621.[13] Lovell explains that the testimony contained admissions that "Lovell . . . sexually assaulted Joyce Yost, conspired to kill her, ultimately killed [her] and attempted to conceal the crime." And Lovell appears to argue, although it is far from clear, that the admission of this testimony requires reversal of his conviction, reasoning that if "this testimony were excluded, the jury would have little [sic] of the crime or its circumstances."[14]

¶48 The State contends that the district court did not err because Lovell's sworn statements did not qualify as allocution, and therefore our holding in *Maestas* did not prevent using the statements at Lovell's trial. Alternatively, the State argues that even "if the trial court erred, the error was harmless beyond a reasonable doubt because admission of Lovell's prior testimony was

---

[13] The *Maestas* court considered whether the State could use inculpatory allocution statements Maestas had made in the sentencing phase of a prior trial after that trial had been reversed and was being retried. *State v. Maestas*, 2002 UT 123, ¶¶ 14, 42, 63 P.3d 621. While a majority of the court recognized a constitutional right to allocution that "would be meaningless" if allocution statements could be used in a future prosecution, the court did not rest its holding on this principle. *See id.* ¶¶ 48–50, 140–41. The court instead held that Maestas's allocution statements were inadmissible under rule 24(d) of the Utah Rules of Criminal Procedure, which says, "If a new trial is granted, the party shall be in the same position as if no trial had been held and the former verdict shall not be used or mentioned either in evidence or in argument." *See id.* ¶¶ 51, 56 (cleaned up).

[14] We note that Lovell does not explicitly argue that this error would require the reversal of his conviction, and the rest of his arguments challenge the penalty phase of the trial. Nevertheless, Lovell concludes his briefing by asserting, "*[a]t the very least*, the Court must reverse and remand for a new sentencing phase." Because Lovell's prior testimony was admitted during the guilt phase, we treat his challenge to its admission as an argument that the error requires us to overturn his underlying conviction.

cumulative of evidence eleven other witnesses provided." The State also argues that it was harmless because the prior testimony "supported [Lovell's] trial strategy to concede guilt in order to convince the jury at the penalty phase that he had taken responsibility for the crimes he committed."

¶49 Lovell does not respond to either of the State's arguments, nor does he explain how the exclusion of this evidence would have altered Lovell's decision to not contest his guilt.

¶50 In part because of the lack of briefing from Lovell on this topic, we will assume, without deciding, that the district court erred when it admitted Lovell's 1993 sentencing testimony. We are willing to make this assumption because the State has demonstrated that even if the admission of this evidence violated Lovell's constitutional rights, its admission was harmless beyond a reasonable doubt.[15]

¶51 "A constitutional error is harmless when it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Mitchell v. Esparza*, 540 U.S. 12, 17–18 (2003) (cleaned up). Here, that means the admission of Lovell's 1993 sentencing testimony was harmless if the State shows, beyond a reasonable doubt, that the jury would have convicted him even if the challenged evidence had been excluded.

¶52 The State presented overwhelming evidence of Lovell's guilt to the jury. The jury heard from William Holthaus, who investigated the kidnapping and sexual assault of Yost. Holthaus testified that he interviewed Yost and that she provided a description that matched Lovell and his vehicle. Holthaus told the jury that Lovell was ultimately charged with these crimes and bound over for trial during a preliminary hearing. He also testified that Lovell had told him "[t]his is not going to trial" and that a month later, Yost had gone missing.

---

[15] As the State points out, we have not conclusively determined that violations of the Utah Constitution require the application of the harmless beyond a reasonable doubt standard used for violations of the United States Constitution. *See State v. Bell*, 770 P.2d 100, 106 n.12 (Utah 1988). We will assume, without deciding, that this is the correct standard to apply because Lovell fails to clear the hurdle he argues should apply.

¶53 The jury also heard from Rhonda Buttars, Lovell's former spouse, who had spoken with the police in exchange for immunity. Buttars testified that Lovell had told her that Yost accused him of rape and that he wanted to kill her because he didn't want to go back to prison.

¶54 Buttars also testified that Lovell had contacted a friend, Billy Jack, offering him several thousand dollars to kill Yost. Buttars explained that Billy Jack did not follow through with the murder. She further testified that Lovell then hired Tom Peters to murder Yost. But Buttars stated that Peters, like Billy Jack, did not do it.[16] Buttars testified that, after these attempts to hire someone failed, Lovell decided to kill Yost himself. Buttars told the jury that she went with Lovell to surveil Yost's apartment.

¶55 Buttars testified that Lovell told her, "I'm going to do it tonight, so drive me over there," and that she drove Lovell to Yost's apartment, dropped him off, and did not hear from him again for several hours. She explained that when she picked Lovell up, he told her that it "was pretty easy" to kill Yost. Lovell recounted to Buttars that he entered Yost's home through an unlocked window, and that he drove her up the canyon and strangled her, stomping on her neck once she fell to the ground. Buttars also testified that Lovell took Yost's watch and tried to pawn it.

¶56 The State then called Detective Terry Carpenter. Carpenter explained that the police fitted Buttars with a hidden recording device to record her conversations with Lovell while he was in prison. Portions of these recordings were played for the jury, and transcripts were admitted into evidence. During these conversations, Lovell admitted to raping Yost. Lovell also detailed that he had plotted to, and eventually did, murder Yost. The jury heard Lovell tell Buttars that he "committed a first-degree felony to cover another felony. It's the death penalty. At the very least they're

---

[16] The State also introduced Tom Peters's earlier testimony that Lovell had told him "this lady was trying to accuse him of raping her and that she was trying to break up his family and that something had to be done." Peters also testified that he took this to mean that Lovell wanted Yost killed, and that Lovell offered him eight hundred dollars after which Peters said he would take care of it.

going to give me life without parole if I cooperate with them and go to them."

¶57 Considering the totality of the evidence before the jury, the admission of the challenged testimony did not cause the jury to convict when it otherwise might have acquitted. Even without Lovell's 1993 testimony, the jury heard recorded statements of Lovell admitting to the crime. Buttars and others testified about Lovell's crimes. Lovell did not cross-examine these witnesses.[17] As such, there is nothing in the record that would allow us to conclude that the jury would not have credited the truth of their testimony. On this record, the State has shown that the admission of Lovell's prior testimony was harmless beyond a reasonable doubt. We affirm Lovell's conviction.

## II. LOVELL RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE PENALTY PHASE OF HIS TRIAL

¶58 Lovell argues that his death sentence must be overturned, and that he must be given a new sentencing hearing because his counsel provided ineffective assistance during the penalty phase of his trial. While Lovell raises multiple claims of ineffectiveness, we focus on one—whether trial counsel was ineffective for failing to adequately object to testimony about Church doctrine and Lovell's status within the Church.[18]

¶59 Essential to a criminal defendant's Sixth Amendment "right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 685–86 (1984) (cleaned up); *see also State v. Gallegos*, 2020 UT 19, ¶¶ 33, 35, 463 P.3d 641. To assess whether a defendant has been denied the representation the United States Constitution promises, we apply the two-part test *Strickland* established. *Strickland* requires the defendant to show that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." 466 U.S. at 687.

---

[17] The sole exception was the cross-examination of Yost, which appeared on the preliminary hearing transcript; however, that cross-examination was brief, and did not seek to challenge her credibility.

[18] Because we vacate Lovell's sentence, we do not opine on any of his other challenges.

¶60 Under *Strickland*'s first prong, our inquiry focuses on "whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688. This is "a deliberately stringent standard that requires us to 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *State v. Carter*, 2023 UT 18, ¶ 27, 535 P.3d 819 (quoting *Strickland*, 466 U.S. at 689). A defendant must overcome this presumption by "identify[ing] the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690.

¶61 "In short, the question of deficient performance is not whether some strategy other than the one that counsel employed looks superior given the actual results of trial. It is whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial." *State v. Nelson*, 2015 UT 62, ¶ 14, 355 P.3d 1031 (cleaned up). Even if counsel fails to object to inadmissible testimony, that decision might—under the circumstances—fall within "the range of legitimate decisions regarding how best to represent a criminal defendant." *See Strickland*, 466 U.S. at 689; *State v. Bermejo*, 2020 UT App 142, ¶ 47, 476 P.3d 148.

¶62 *Strickland* instructs us to look at "all the circumstances" of the allegedly deficient representation. 466 U.S. at 690. It is therefore helpful to review the constitutional limitations on imposing a death sentence and Utah's statute governing sentencing in a capital case.

*A. The Constitutional Limitations on Capital Punishment*

¶63 The death penalty is profoundly different from any other punishment that the State can impose because it is unique "in both its severity and its finality." *Gardner v. Florida*, 430 U.S. 349, 357–58 (1977) (plurality opinion); *Monge v. California*, 524 U.S. 721, 732 (1998). The United States Supreme Court has "recognized an acute need for reliability in capital sentencing proceedings." *Monge*, 524 U.S. at 732. This need for reliability also "requires a correspondingly greater degree of scrutiny of the capital sentencing determination." *California v. Ramos*, 463 U.S. 992, 998–99 (1983). "Because the death penalty is the most severe punishment, the Eighth Amendment applies to it with special force." *Roper v. Simmons*, 543 U.S. 551, 568 (2005).

¶64 The United States Supreme Court has explained that "if a State wishes to authorize capital punishment it has a constitutional

responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (plurality opinion). This requires that the death penalty "be limited to those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution." *Roper*, 543 U.S. at 568 (cleaned up).

¶65 A death sentence will generally satisfy these constitutional limitations if it meets two requirements. *See Kansas v. Marsh*, 548 U.S. 163, 173–74 (2006). The Constitution first requires "that a capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Loving v. United States*, 517 U.S. 748, 755 (1996) (cleaned up). This narrowing is accomplished "by requiring that the sentencer find at least one aggravating circumstance." *Id.*

¶66 The State "must give narrow and precise definition to the aggravating factors that can result in a capital sentence." *Roper*, 543 U.S. at 568. Otherwise, "a death penalty system could have standards so vague that . . . a pattern of arbitrary and capricious sentencing . . . could occur." *Godfrey*, 466 U.S. at 428 (cleaned up). For example, in *Godfrey*, the Court overturned a death sentence that was "based upon no more than a finding that the offense was 'outrageously or wantonly vile, horrible and inhuman.'" *Id.* The Court explained that this finding was insufficient to impose a death sentence because "[a] person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman.'" *Id.* at 428–29, 433.

¶67 Finding an aggravating circumstance "is not an end in itself." *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988). A death sentence cannot be automatically imposed merely because the sentencer finds a narrow and precisely defined aggravating factor. *See Blystone v. Pennsylvania*, 494 U.S. 299, 304–05 (1990). Instead, the Constitution imposes a second requirement—that the sentencer "render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Marsh*, 548 U.S. at 174; *see also Lockett v. Ohio*, 438 U.S. 586, 606 (1978) (plurality opinion) (holding that the Constitution demands an

"individualized consideration of mitigating factors" to impose a death sentence).

¶68 Considering this second principle, the Supreme Court has held "that the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (quoting *Lockett*, 438 U.S. at 604). Put differently, a defendant has "the right to present sentencers with information relevant to the sentencing decision," and the sentencer is "oblige[d] . . . to consider that information in determining the appropriate sentence." *Marsh*, 548 U.S. at 175.

¶69 Further, a jury in a capital proceeding must make its sentencing determination "with the appropriate awareness of its truly awesome responsibility" to determine whether death is the appropriate punishment in a specific case. *Caldwell v. Mississippi*, 472 U.S. 320, 341 (1985) (cleaned up). We generally assume that jurors will take their role seriously and "act with due regard for the consequences of their decision." *Id.* at 330 (cleaned up). But if a jury's sense of responsibility has been diminished, a decision to impose the death penalty might not meet "the Eighth Amendment's heightened need for reliability in the determination that death is the appropriate punishment in a specific case." *Id.* at 340–41 (cleaned up).

¶70 In an effort to conform with these constitutional requirements, Utah provides statutory guidance on when the death penalty may be imposed. In Utah, the State must convince the jury of two elements beyond a reasonable doubt: (1) that the aggravating circumstances outweigh the mitigating circumstances, and (2) that the death penalty is justified and appropriate under the circumstances.[19] UTAH CODE § 76-3-207(5)(b). In weighing the

---

[19] The statute provides a non-exclusive list of mitigating circumstances, including:

> (a) the defendant has no significant history of prior criminal activity; (b) the homicide was committed while the defendant was under the influence of mental or emotional disturbance; (c) the defendant

(continued . . .)

aggravating and mitigating circumstances, the jury does not simply compare their numbers, but rather it considers "the totality of the . . . circumstances in terms of their respective substantiality and persuasiveness." *State v. Maestas*, 2012 UT 46, ¶ 265, 299 P.3d 892 (cleaned up).

¶71 A death sentence is "never mandated or imposed automatically," even if no evidence is offered in mitigation. *State v. Lafferty*, 2001 UT 19, ¶ 128, 20 P.3d 342. And "[t]he burden never shifts to the defendant." *Id.* In other words, in Utah capital cases, death is never the default. The State must prove beyond a reasonable doubt that death is the appropriate sentence on the individual facts of each case.

### B. Trial Counsel's Failure to Adequately Object to Testimony Regarding Church Doctrine and Lovell's Excommunication from the Church Was Unreasonable

¶72 Lovell argues that his counsel were deficient because they failed to adequately object to testimony that he had been excommunicated from the Church and testimony concerning the Church's doctrine regarding forgiveness and readmission to

---

acted under duress or under the domination of another person; (d) at the time of the homicide, the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirement of law was impaired as a result of a mental condition, intoxication, or influence of drugs . . . (e) the youth of the defendant at the time of the crime; (f) the defendant was an accomplice in the homicide committed by another person and the defendant's participation was relatively minor; and (g) any other fact in mitigation of the penalty.

UTAH CODE § 76-3-207(4).

The statute also allows the jury to consider aggravating circumstances outlined in section 76-5-202. *Id.* § 76-3-207(3). For example, the statute allows the jury to consider if "the actor committed homicide for the purpose of . . . preventing a witness from testifying." *See id.* § 76-5-202(2)(a)(xi)(A).

The jury may also consider "any other facts in aggravation or mitigation of the penalty that the court considers relevant to the sentence." *Id*. § 76-3-207(2)(a)(iv).

Church membership. Lovell recognizes that his counsel attempted to object to some of this testimony. But Lovell asserts that these objections were "ineffective."

¶73 Lovell's mitigation strategy was clear. The State had presented evidence of his heinous crimes. To impose the death penalty, the State needed to convince every juror that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. To escape the death penalty, Lovell needed only a single juror to conclude that the State had not met its burden. Lovell sought to seed that doubt, in part, by presenting himself as a different person from the one who had kidnapped, raped, and murdered Yost. Lovell tried to show he had changed by admitting to and showing remorse for those crimes. And he called witnesses who attempted to paint a picture of a model prisoner who had made genuine steps toward rehabilitation.

¶74 Lovell began his mitigation case by calling Dr. Newton. Newton was "a religious volunteer" at the prison, where he acted as Lovell's "clergy leader." Newton testified that, based on conversations with prison officers, he thought that Lovell "was regarded as a model prisoner." He explained that the officers "all spoke very highly of" Lovell. Newton also explained that Lovell had taken multiple classes while in prison and that he was "involved with two or three charitable organizations." And he testified that he believed Lovell "was very remorseful." Indeed, Lovell had expressed remorse for his crimes "many times."

¶75 Lovell's questioning of Newton never strayed into religion. Beyond the background information necessary to explain that Newton met Lovell as his "clergy leader," the only hint of religion from Newton's direct examination came from Newton's response to a general question:

> Q. So what did your discussions with Mr. Lovell entail when you met with him at the prison?
>
> A. . . . . We talked about religion on a fairly basic level, like Ten Commandment kind of stuff . . . at some point [Lovell] had some questions about things he had read in the Bible and the Book of Mormon, so we would talk about that on occasion. Sometimes we talked about his family.

¶76 Despite the lack of religious testimony during Lovell's direct examination of Newton, the State questioned Newton almost exclusively about religious topics. The State began its cross-examination by asking Newton if he "w[as] a bishop for the Church of Jesus Christ of Latter-[d]ay Saints." After Newton said he was, the State began a long line of questioning about the Church and its doctrine.

¶77 The State first questioned Newton about Church organization and policy, eliciting the following testimony:

> Q. . . . [I]n the LDS Church what is the highest governing body?
>
> A. Well, the [F]irst [P]residency.

¶78 The prosecutor then questioned Newton about Lovell's relationship with the Church, asking:

> Q. . . . [I]s the defendant currently a member of the LDS Church?
>
> A. [He] [i]s not.
>
> Q. Okay. Was he ever a member of the church?
>
> A. Yes, he was.

¶79 The prosecutor then asked Newton:

> Q. . . . [A]re you aware that the handbook [of instructions for Church leaders] requires the convening of [a] disciplinary council when evidence suggests that an individual has committed murder?

Lovell's counsel objected for lack of foundation, arguing that "[Newton] has no expertise or knowledge of the facts." The court overruled the objection and allowed the State to continue its questioning.

¶80 Newton testified that he did not convene a disciplinary council and that he would "have to just say that's a fault of mine."

¶81 Following this testimony, the prosecutor shifted its focus to Lovell's eventual excommunication from the Church, asking:

> Q. You are aware that the defendant has since been excommunicated by the church?
>
> A. I am aware of that.

Q. Okay. Now, in order for an individual to be readmitted into the church after being excommunicated for murder, do you know who makes that decision, that ultimate decision, if they're remorseful and changed enough that they can join the church again?

A. . . . Well, I would assume that it would start with the local bishop . . . . And then the bishop would talk to the stake president . . . . And then the stake president would talk to someone higher up in the church. The decision wouldn't be made at the local level. It would be made higher up in the church.[20]

Q. Would it surprise you at all that . . . the [F]irst [P]residency is the body that makes that determination?

A. No, that doesn't surprise me.

Lovell's counsel did not object.

¶82 The State persisted in this line of questioning, eliciting the following testimony:

Q. So you would agree, then, that the determination of remorse or change ultimately can only be made by the [F]irst [P]residency, not by anyone else within the church?

A. Well, they certainly are the ones that have the ultimate say about reinstatement. So, yes.

Q. Okay. And you're aware that the defendant has not been readmitted into the church?

A. Yes.

Q. He has not been rebaptized?

---

[20] A stake president "oversees Church programs in a defined geographic area composed of individual congregations called wards . . . . He also oversees the activities of the bishops or ward leaders, counseling them as needed." *Stake President*, THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS NEWSROOM, https://newsroom.churchofjesuschrist.org/article/stake-president [https://perma.cc/24VJ-XGYJ].

A. I knew that.

Lovell's counsel did not object.

¶83　The State continued its questioning:

Q. In the LDS Church what is that process called, the process of changing one's life, essentially?

A. You could call it repentance.

Q. . . . Would you say that feeling sorrow or remorse is part of that process?

A. Yes.

Q. . . . Is there a particular kind of sorrow that the person has to have?

A. I don't understand your question.

Q. Okay. Are you familiar with the phrase "[g]odly sorrow"?

A. Well, I've heard of it. I'm not sure I know what that means.

Again, counsel did not object.

¶84　The State continued:

Q. That's fine. Would you agree that there is a difference between expressing remorse . . . and actually being remorseful? . . .

A. Sure. People can say anything.

Q. Okay. Okay. Now, the defendant has made expressions of remorse to you. He's expressed remorse to you, correct?

A. Yes.

Q. . . . [B]ut you can't say that he is in fact totally remorseful; is that correct?

A. I don't think anyone can.

¶85　The State then began questioning Newton about Lovell's repentance, asking:

Q. As part of that process of repentance, is a full and complete confession part of that process to church leaders and victims?

A. Sure. Yes.

Q. Okay. And you had indicated earlier that the defendant hasn't told you all of the facts related to this case, the murder of Joyce Yost; is that correct?

A. That's correct.

Lovell's counsel objected to this question, arguing that it was outside the scope of cross-examination because "the crime took place prior to Mr. Newton's involvement with Lovell." The court overruled the objection.

¶86 Lovell posits that counsel should have lodged additional challenges to this testimony because it "[s]uggest[ed] the church is in charge of adequacy of remorse and acceptance of responsibility." And that the testimony therefore called on the jury to base its decision on religious principles, "usurp[ing] the jury's function, [and] depriving Mr. Lovell of a fair and independent jury." Lovell also argues that the objections his counsel made were ineffective.

¶87 We agree that reasonable counsel would have recognized both the problems with this testimony and its potential to invite the jury to base its decision on something other than its own assessment of Lovell. And we agree that reasonable counsel would have done something—either object to the entire line of questioning, seek curative instructions, or move for a mistrial—to protect their client. [21]

---

[21] Lovell does not clearly identify what objection trial counsel should have made. At one point, he argues that the testimony amounted to prosecutorial misconduct. And at other times, he argues that the testimony "usurped the jury's function, depriving Lovell of a fair and independent jury." Typically, the failure to identify specifically how trial counsel erred will preclude succeeding on a claim of ineffective assistance. As we explained in *State v. Gallegos*, the defendant "has the burden to overcome a strong presumption of reasonableness which he must do by identifying the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." 2020 UT 19, ¶ 37, 463 P.3d 641 (cleaned up). We, under the United States Supreme Court's instruction, have a greater concern for reliability when the death sentence is imposed. *See Lockett v. Ohio*, 438 U.S.

(continued . . .)

¶88 During the penalty phase of a capital case, the evidence allowed is exceedingly broad. The court may admit "[a]ny evidence the court considers to have probative force . . . regardless of its admissibility under the exclusionary rules of evidence." UTAH CODE § 76-3-207(2)(b). This statute naturally limits counsel's ability to challenge evidence. The broad discretion of the court does not, however, mean all evidence is admissible. At the very least, evidence must be probative. *See id.* And we have contemplated that evidence may be inadmissible during the penalty phase if it is "unduly prejudicial" by being confusing or inflammatory to the jury. *Maestas*, 2012 UT 46, ¶ 286; *see also Lafferty*, 2001 UT 19, ¶¶ 105–06.

¶89 We first note that the objections trial counsel made to Newton's testimony missed the mark. Counsel objected to the State asking Newton if he was "aware that the handbook requires the convening of [a] disciplinary council when evidence suggests that an individual has committed murder?" Counsel argued that Newton "has no expertise or knowledge of the facts." But the State had laid foundation—without objection—that Newton was a Church bishop and that the Church handbook "outlines the policies and procedures" for bishops and other Church leaders. The State laid sufficient foundation to ask Newton about his duties as a bishop within the handbook.

¶90 Counsel's second objection was similarly anemic. Counsel objected to the State asking Newton "that the defendant hasn't told you all of the facts related to this case, the murder of Joyce Yost; is

---

586, 604 (1978) (plurality opinion); *see also State v. Wood*, 648 P.2d 71, 81 (Utah 1982). This greater concern for reliability "requires a correspondingly greater degree of scrutiny" when reviewing a death sentence. *California v. Ramos*, 463 U.S. 992, 998–99 (1983).

As such, we "have the sua sponte prerogative in [death penalty] cases to notice, consider, and correct manifest and prejudicial error which is not objected to at trial or assigned on appeal, but is palpably apparent on the face of the record." *State v. Tillman*, 750 P.2d 546, 552–53 (Utah 1987). Here, we are not called upon to notice, consider, or correct an unobjected-to error; trial counsel weakly objected to some of the problematic questioning, and appellate counsel generally identified and briefed the issue. We are, however, required to look past briefing deficiencies that might have doomed a similar argument in a non-capital case.

that correct?" Counsel argued that this question was beyond the scope of cross-examination because "the crime took place prior to Mr. Newton's involvement with Mr. Lovell." However, this question was not outside the scope of cross-examination because Newton testified about his knowledge of Lovell's crimes during direct examination.

¶91   Lovell's counsel asked Newton: "in you[r] discussions with Mr. Lovell about the crimes he was involved in, did you have a chance to discuss those issues with him at some time?" And Newton testified: "I don't recall that [Lovell] and I ever discussed his crimes. I heard about it from guards and others. But he and I never discussed any of the details of his crime other than, like I say, I knew why he was there." This testimony was sufficient to defeat an objection based upon exceeding the scope of direct examination.

¶92   Even more troubling than the misaimed objections are the many instances counsel neglected to object at all. Counsel did not object to the testimony regarding Lovell's excommunication nor the testimony about Church doctrine concerning repentance and remorse. The problem with Newton's testimony was not that he lacked foundation to provide it, nor that it exceeded the scope of direct examination—it was that the entire line of questioning and the testimony it elicited was unduly prejudicial.

¶93   We have explained that counsel's performance may be deficient when they fail to challenge testimony that is "obviously improper." *State v. Larrabee*, 2013 UT 70, ¶ 26, 321 P.3d 1136. Here, reasonable counsel would have recognized the obvious impropriety of Newton's religious testimony and challenged it.

¶94   That Newton's religious testimony was unduly prejudicial would have been apparent to reasonable counsel. The United States Supreme Court has instructed that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell*, 472 U.S. at 328–29. This is precisely what the unobjected-to testimony invited the jury to do.

¶95   The State's cross-examination suggested that Lovell's excommunication from the Church and subsequent failure to be readmitted by its First Presidency was evidence that he lacked genuine remorse. It insinuated that the jury could consider whether the Church had found Lovell sufficiently remorseful as a proxy for

deciding themselves whether he was truly a changed person. This testimony invited the jury "to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere" because the Church had already determined that Lovell was not remorseful by not readmitting him to membership. *See id.* at 329.

¶96 In other words, this testimony encouraged the jury to not thoroughly consider Lovell's evidence of his remorse. By inserting a religious test for remorse into the proceedings, the State gave the jury a way out of making a decision that is difficult for any person to make about another: whether a defendant has truly changed. The State offered jurors an off-ramp by intimating that it could use readmission to Church membership as a gauge for whether Lovell was actually remorseful and had changed his ways. The testimony also invited the jury to discredit Newton's (and the other witnesses') assessment of Lovell by substituting an ecclesiastical determination of Lovell's rehabilitation for the jurors' own review of the evidence. Any reasonable attorney would have recognized the risk Newton's testimony posed to Lovell's mitigation case and challenged it.

¶97 We are not the only court to have underscored the potential for religious doctrine to undermine a defendant's right to a fair trial. Indeed, the use of religiously charged arguments supporting death has been "universally condemned . . . as confusing, unnecessary, and inflammatory"; they "have no place in our non-ecclesiastical courts and may not be tolerated there." *Bennett v. Angelone*, 92 F.3d 1336, 1346 (4th Cir. 1996). In *Romine v. Head*, the Eleventh Circuit reversed a sentence of death because "the prosecutor argued Biblical law to the jury as a basis for urging it to eschew any consideration of mercy and sentence [the defendant] to death." 253 F.3d 1349, 1358, 1371 (11th Cir. 2001).

¶98 The Superior Court of Pennsylvania has likewise held that referring to testimony as "God's truth" improperly "inject[ed] a court proceeding with religious law." *Commonwealth v. Chmiel*, 777 A.2d 459, 467 (Pa. Super. Ct. 2001). In that case, the court found that "[b]y arguing that [the witness] speaks 'God's truth,' . . . [t]he prosecutor elevated [the witness's] testimony to that of God," interjecting religious law for the jury's consideration. *Id.* And in *Commonwealth v. Chambers*, the Pennsylvania Supreme Court considered a prosecutor's argument that, as "the Bible says, 'and

the murderer shall be put to death.'" 599 A.2d 630, 644 (Pa. 1991). The court concluded that this argument was improper because it "advocates to the jury that an independent source of law exists for the conclusion that the death penalty is the appropriate punishment." *Id.* The court further held that this argument was "a deliberate attempt to destroy the objectivity and impartiality of the jury which cannot be cured." *Id.*

¶99 In *People v. Hill*, the California Supreme Court explained that "an appeal to religious authority in support of the death penalty is improper because it tends to diminish the jury's personal sense of responsibility for the verdict." 952 P.2d 673, 693 (Cal. 1998). The court made its determination based on the State's closing argument where it said that "the biblical maxim 'Vengeance is mine sayeth the Lord' should not dissuade the jury from imposing the death penalty, for the Bible also says 'an eye for an eye, a tooth for a tooth.'" *Id.* at 692 (cleaned up).

¶100 Furthermore, here there was no reasonable basis for Lovell's trial counsel to forego objecting to Newton's religious testimony. The State was eliciting evidence that undermined the entire theory of mitigation—that Lovell was a changed man who was remorseful for his crimes. The district court suggested that counsel should have continued challenging this testimony, saying that it "thought there were areas that we covered with the three ecclesiastical leaders that . . . were not probative at all," but the court "let it go" because "no one seemed to feel that way."

¶101 The State does not defend the admissibility of the challenged testimony, but it contends that Lovell's counsel were not ineffective because they had a strategic reason to not challenge the testimony. "If it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance." *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871. The State posits that reasonable counsel could have decided not to object because doing so could have "risked excluding testimony Lovell wanted to present."

¶102 The State claims that "[r]eligious matters played a central role in Lovell's defense," and therefore "counsel could reasonably think that if he argued that discussion of religious matters was improper, the court would also prevent Lovell from presenting evidence he wanted to present." The State argues that "[r]eligious references permeated the testimony of Becky Douglas" and that

"competent counsel could choose not to argue that it was improper for the State to ask about religious matters because counsel knew Douglas would be talking about religious matters."

¶103   We credited a similar argument in a dissimilar case. *See generally State v. Vallejo*, 2019 UT 38, 449 P.3d 39. In *Vallejo*, we determined that defense counsel made a reasonable decision not to object to religious testimony because the defense sought to introduce "Vallejo's own religion and role as a religious leader." *Id.* ¶ 77. We noted that "[d]uring the opening statement, Vallejo's trial counsel commented that Vallejo 'had received his church calling and was his ward's bishop.'" *Id.*

¶104   We explained that "Vallejo also introduced evidence of his own religious conduct, testifying that he 'went on a mission for a couple years' and that later he 'was a bishop,' which he 'loved.'" *Id.* Vallejo "testified that his responsibilities as a bishop took 'fifteen to twenty hours of his week.'" *Id.* (cleaned up). We found that trial counsel's decision to promote this religious theme, referenced from the very beginning of Vallejo's case, indicated that counsel could have reasonably not objected to other religious testimony. *Id.* That is, Vallejo's counsel could have reasonably feared that if he objected to the State's religious-themed questions, he could lose a large portion of what he hoped to present to the jury.

¶105   Unlike in *Vallejo*, Lovell's mitigation case did not rely on religion. Indeed, it appears that the defense carefully attempted to avoid wading into religious waters during its direct examination of Newton. During Newton's direct examination, the defense elicited minimal testimony about religion, limited to Newton forming a relationship with Lovell as his "clergy leader" and as a "religious volunteer" at the prison. Newton's direct examination was the most overtly religious when counsel asked Newton to describe his discussions with Lovell. Newton volunteered that when he and Lovell would meet, they would talk about things Lovell had "read in the Bible and the Book of Mormon." At no point during their examination of Newton did Lovell's counsel seek to talk about repentance or the Church as an organization. In fact, at no point did counsel even identify the Church, much less that Newton had been Lovell's bishop. This testimony only came in through the State's questioning.

¶106  To be sure, Lovell's counsel asked the next two witnesses, Lovell's former Church bishops Webster and

Thompson, about Lovell's status with the Church. Both witnesses testified that Lovell had been excommunicated and that they were not aware whether Lovell had asked to rejoin the Church. Lovell's counsel even asked Webster about his "impression of [Lovell's] progress towards remorse and repentance." But this questioning can be explained as Lovell's counsel attempting to mop up after the disastrous testimony that the State elicited from Newton. That is, after the State put evidence before the jury that only the Church's First Presidency could readmit someone like Lovell into Church membership and that this decision would turn on whether the First Presidency concluded that Lovell had repented and shown remorse, Lovell's counsel needed to try and convince the jury that Lovell had not sought readmission.[22] The questions posed to Webster and Thompson appear to be a gambit to explain to the jury that the Church's First Presidency had made no assessment of Lovell's repentance because Lovell had not started the process to be readmitted. Unlike in *Vallejo*, Lovell's counsel did not open the door to religious themes. They tried to make the best of the situation once the State had thrown that door open.

¶107 The State also argues that reasonable counsel could have decided not to object to Newton's testimony because they feared they would lose the ability to elicit favorable testimony from Becky Douglas. Though some of Douglas's testimony certainly had a religious flavor, that was not the sole, or even primary, purpose of her testimony. Indeed, Lovell's counsel focused their questioning of Douglas on her relationship with Lovell and his volunteer work with her organization.

¶108 In essence, Douglas testified that when she met with Lovell, she felt "this incredible remorse, this sadness, [from Lovell]," explaining that "he just felt so, so desponden[t], that there was so much despair of what he had done." She also testified "that by going through 30 years of prison, [Lovell] has become literally a gentle and a kind man." She also testified that she "ha[s] absolute confidence that the [Lovell] I know is the real [Lovell] now" and

---

[22] We also note that neither Webster nor Thompson presented their opinions on Lovell's remorse as anything but their personal beliefs. To the contrary, both witnesses testified that they did not represent the Church and that they could not truly know what was in Lovell's heart.

that she "wouldn't have any hesitation to invite him into [her] home" if he were ever released.

¶109 Unlike the testimony the State sought to elicit from Newton, Douglas's testimony was not about religious doctrine, and, to the extent her testimony possessed a religious tinge, Douglas volunteered that in her responses. For example, on direct examination Lovell's counsel asked Douglas questions to which Douglas provided religiously flavored responses.

¶110 Lovell's counsel asked:

> Q. I understand that in 2012 that you made a visit to [Lovell] in the prison?
>
> A. I did.
>
> Q. Can you tell us how that came about?

Douglas then explained that an employee with her charity had a relative who was "a stake president . . . in the Mormon Church" and that "[p]art of [his] ministry" is working at the prison. She continued explaining that her employee was invited to meet Lovell and that her employee "was very touched by th[e] experience," after which Douglas asked the stake president "if he could arrange for me to go see [Lovell]."

¶111 Douglas recounted how she was put in touch with Lovell's bishop, who helped arrange for her to visit Lovell. After Douglas had explained this background information, Lovell's counsel asked:

> Q. Did you have any concerns about this visit with [Lovell] coming up about what you would talk about?
>
> A. Yeah. I—I mean, I'd been writing to him, but I didn't really feel like I knew him. I—what was I going to talk about? I mean, I literally had no idea what I was going to talk about. . . .
>
> Q. Did you have a discussion about that concern with [Lovell's] bishop?
>
> A. I did. Well—yes, with both his bishop and his stake president . . . . And they both suggested that if I should get in, that I should talk to him about the atonement.

And I said, "Well, I mean, you all haven't done this?" And they said, "Well, yes, but he seems to be stuck spiritually. He just simply cannot forgive himself."

His bishop . . . said ["]he's recently been rereading the transcripts of his trial, and he has just reached the conclusion that he will never, ever be able to forgive himself. And we just feel he's—spiritually, he's just kind of stuck there. He can't move past that and maybe you could talk to him about the atonement and Jesus Christ."

¶112   Trial counsel asked Douglas to describe her visit with Lovell, and she testified that: "He was teary. He was so excited to meet me. We had been corresponding at this point for, I guess, probably five years, close to five years, and he was very excited. And he sat and I sat and we—we talked." She explained that they talked for a while, and after a break in the discussion she said, "I would like to talk to you about the atonement if that's okay." Douglas then testified:

> [Lovell] immediately became very guarded. He hung his head down and he said, "You know, I'd honestly rather not talk about that."
>
> And I said, "Oh, well, you know, I don't want to upset you any. Why?"
>
> And he—he literally and tears just started rolling down his face, and he said, "You are going to tell me I need to forgive myself. Everybody keeps telling me I need to forgive myself." And he said, "I will never forgive myself." He said, "I have tried. So I cannot forgive myself. So I don't want to talk about it." He said, "I've been through this and through this and through this." And he said, "Let's talk about something else."
>
> And I said, "Well"—and by now he was just—I mean he was weeping. And I said, "Would it be okay if I just talked and you listened? Would that be all right?"
>
> And he said, "Well, okay." He kind of shrugged basically. And I said, "Okay. Well, [Lovell] have you read the New Testament?"

34

¶113   At this point, the State objected, arguing that "if she's going to give an exposition on the doctrinal basis of the New Testament, I think it's inappropriate." Lovell's counsel explained that Douglas would not be discussing religious doctrine but that she would explain how after she mentioned the New Testament, Lovell "recall[ed] a letter she wrote to him years before." Lovell's counsel also explained that this testimony "goes to the strength of the connection between the two of them."

¶114   With this explanation, the court allowed the testimony to continue, and Lovell's counsel asked:

> Q. You had a brief discussion with [Lovell] about the New Testament?
>
> A. Yes. And the reason I mentioned it is because I was specifically talking about Paul. When I mentioned Paul's name, [Lovell] brightened and he said, "Oh, you wrote about Paul in your letter of" whatever, November 2007.
>
> And I said, "Really?" And he had my letters in a little folder right there and he opened it and they were just pristine and he pulled it out. He said, "Yes, you wrote that even though Paul was in prison, he did a lot of good in the world through his letters, and because of that we know Christian doctrine today."
>
> And I said, "You are in prison, but you are already trying to do good by supporting a child in India affected by leprosy. You are also reaching out."
>
> And so I thought that was very interesting.
>
> The reason I brought this up, and I've only met [Lovell] one time. So as a character witness, I don't have—I don't have a whole lot. I just have this one meeting I had with [Lovell]. But it was a powerful meeting and that's why I'm here today.

¶115   Although Douglas's narration of her visit certainly contained numerous religious references, the important testimony—that Lovell was remorseful, along with her opinion that he had changed—did not rely on religion. Had Douglas simply never mentioned anything religious, her testimony would still provide evidence that Lovell felt remorse for his crime. And unlike

the State's questioning of Newton, Douglas's testimony did not devolve into religious doctrine or whether Lovell's ecclesiastic leaders had decided that he was remorseful.

¶116   Additionally, during the 23B hearing, the district court found that there was an abundance of religious testimony that Douglas "wanted to share with the jury" but was not given the opportunity to provide. The court found that Douglas wanted to tell the jury that "Lovell took religious instruction courses for four years, he studied the scriptures, he reconciled himself to God, he watched a PBS series on the New Testament and was moved by it, [and] he encouraged inmates who were discouraged and did not have God in their lives." The court also found that "Douglas wanted to tell the jury that because of . . . Lovell's actions, over forty inmates wrote to her telling her that . . . Lovell had told them, 'There is a way for you spiritually to come back to the Lord.'"

¶117   Had Lovell intended to use Douglas to present an overtly religious theme at trial, as the State contends, it stands to reason that he would have sought to solicit at least some of this testimony from Douglas. And the fact that Lovell avoided this religious testimony leads us to believe that the religious aspects of Douglas's testimony were not part of counsel's trial strategy.

¶118   If the district court were to remove all religious references from Newton and Douglas's testimony, the State could not have established Lovell's excommunication or the doctrine of repentance. But Lovell could have still established his remorse and changed character through Douglas. Consequently, continued objections to Newton's testimony did not present a risk of excluding the mitigating evidence in Douglas's testimony.

¶119   Moreover, even if further objections to Newton's religious testimony presented a risk of excluding evidence that Lovell wanted to present, the failure to object was still unreasonable. Reasonable counsel in these circumstances would not have foregone objecting to prejudicial religious testimony based on a hope of introducing the religious testimony Douglas had to offer.[23] The severe prejudicial nature of Newton's

---

[23] This opinion should not be read to suggest that all evidence with a religious tinge is categorically improper. Rather, we recognize that religiously themed testimony can sometimes exert a

(continued . . .)

cross-examination testimony, challenging the defense theme that Lovell was remorseful, and implying that the jury could look to the actions of ecclesiastical leaders to decide whether Lovell had changed belies any reasonable strategy.

¶120 In the end, reasonable counsel might have done something other than raise additional objections in response to Newton's testimony, such as move for a mistrial or seek a curative instruction. But because of the life-or-death stakes of the proceeding and the potential for such obviously improper testimony to prejudice the jury, reasonable counsel would have done *something* more to try and neutralize it. Lovell's trial counsel lodged two misaimed objections and tried to clean-up with subsequent witnesses. That was objectively unreasonable.

*C. The Admission of Improper Testimony Prejudiced Lovell*

¶121 To prevail on an ineffective assistance of counsel claim, a defendant must show more than deficient performance. Counsel must also demonstrate that the error had a prejudicial effect on the outcome. *Strickland*, 466 U.S. at 687. This requires that the defendant "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In the specific circumstances of a challenge to a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. And "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Put differently, the prejudice prong is satisfied when the defendant shows "that counsel's errors were so serious as to deprive the defendant of . . . a trial whose result is reliable." *Id.* at 687.

¶122 The State argues that even if trial counsel's performance was deficient, Lovell fails to show prejudice because the jurors were faced with "overwhelming evidence in favor of the death penalty." The State also argues that this is especially true considering that the alternative sentence was life with the opportunity of parole. The State avers that "no reasonable probability exists that even one

powerful pull, and counsel and courts must be on-guard for religious testimony that might unduly prejudice a defendant.

juror would have voted for life with parole if only the challenged evidence had been excluded."

¶123  We reiterate that the death penalty is "never mandated or imposed automatically," even if no evidence is offered in mitigation. *Lafferty*, 2001 UT 19, ¶ 128. The State must convince the entire jury—beyond a reasonable doubt—that the aggravating circumstances outweigh the mitigating circumstances, and that the death penalty is justified and appropriate under the circumstances. UTAH CODE § 76-3-207(5)(b).

¶124  Without the improper religious testimony, there is a reasonable probability that at least one member of the jury would not have been convinced that the State had met its burden.

¶125  Prejudice is always a difficult inquiry, requiring reconsideration of the entire evidentiary picture to determine whether the outcome might have been different absent counsel's deficient performance. *See Strickland*, 466 U.S. at 695 ("In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."). But here, we can see that counsel's errors altered the balance between the aggravators and the mitigators in a way that likely impacted at least one juror's decision. Moreover, these errors created a reasonable probability that at least one juror's sense of responsibility regarding the decision to impose death was diminished.

¶126  The bulk of the aggravating evidence before the jury focused on the nature of the crime and the severe and lasting impact it had on Yost's family. The jury heard the details of how Lovell attempted to hire two people to murder Yost and eventually murdered her himself. The State highlighted that Lovell took Yost's life to prevent her from testifying that he had raped her. The State also offered witnesses who opined that Lovell was untruthful, manipulative, cold, calculating, and an escape risk.

¶127  Lovell attempted to counter this testimony, in part, with two experts opining and explaining why they believed Lovell experienced diminished culpability. But the overwhelming majority of Lovell's mitigation evidence was testimony from people who had met Lovell while he was in prison and believed that he was remorseful for his crime and that he had taken steps to change his life.

¶128 Therefore, the primary dispute during Lovell's sentencing proceedings was the depth of his remorse and the sincerity of his efforts to rehabilitate. While remorse is not something that can be determined for certain, the improper religious testimony gave jurors a proxy to use in lieu of personally deciding whether Lovell was remorseful. The religious testimony told them they could look to the Church and its leaders who, Newton's testimony suggested, had evidently determined that Lovell had not shown the requisite remorse for readmittance to Church membership. Newton, together with the State's questions, informed the jury that Lovell would have to repent and show remorse to be readmitted. The State's questioning and Newton's responses invited the jury to conclude that Lovell had not been readmitted into the Church because he was not sufficiently remorseful.

¶129 This highlights why many courts have ruled that certain religious testimony can distort a jury's deliberations. *See, e.g.,* *Bennett*, 92 F.3d at 1346; *Hill*, 952 P.2d at 693; *Romine*, 253 F.3d at 1358; *Chambers*, 599 A.2d at 644; *Chmiel*, 777 A.2d at 467. It calls on jurors to rely on something other than their own consideration of the evidence to answer the difficult questions put to them. *See Caldwell*, 472 U.S. at 328–29; *see also Chandler v. Florida*, 449 U.S. 560, 574 (1981) ("Trial courts must be especially vigilant to guard against any impairment of the defendant's right to a verdict based solely upon the evidence and the relevant law."). And Newton's testimony altered the entire evidentiary picture by weakening all the evidence Lovell presented about his remorse and efforts to rehabilitate. *See Strickland*, 466 U.S. at 695–96 (explaining that "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture").

¶130 Even though Lovell's counsel attempted to mitigate the harm from the excommunication testimony by eliciting testimony from Newton and the other bishops that they were not aware if Lovell had sought readmittance, the harm had already been done. Because Newton's excommunication testimony went to the entirety of Lovell's mitigation argument, it could not be isolated. And the follow-up testimony only served to remind the jury of the State's implicit assertion—that Lovell had not sufficiently changed because he had not sought to repent and rejoin the Church. And, perhaps more to the point, the fact that Lovell had not sought to be

readmitted suggested to the jury that Lovell knew he could not convince the Church's First Presidency that he was truly remorseful.

¶131   The prejudicial nature of Newton's testimony is even more acute considering our State's religious demographics.[24]

¶132   The prosecution's cross-examination of Newton suggested to the jurors that they could look to the Church and its leaders, who "are the living oracles of God" according to Church doctrine. THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, TEACHINGS OF THE LIVING PROPHETS STUDENT MANUAL 45 (2016) (quoting Joseph Fielding Smith, *The First Presidency and the Council of the Twelve*, 69 THE IMPROVEMENT ERA 977, 978 (1966)). A juror who was a faithful Church member might reasonably have believed that Lovell's excommunication and the fact that he had not been readmitted could be interpreted as evidence of divine guidance that he was not remorseful. Or, at the very least, that Lovell did not believe that he could demonstrate to the First Presidency that his remorse was genuine.

¶133   Under different circumstances, our court of appeals has found that testimony of a defendant's excommunication likely had a prejudicial effect on a conviction in part because of Utah's unique religious demographics. *See State v. Hood*, 2018 UT App 236, ¶ 25 n.6, 438 P.3d 54. In *Hood*, the court of appeals held that testimony of a defendant's excommunication from the Church was improperly admitted. *Id.* ¶ 52. The court concluded that there was a reasonable probability that this testimony affected the outcome of the trial. *Id.* ¶ 57. The court's conclusion rested, at least in part, on the fact that a Utah jury is "likely to be familiar with the type of conduct that would trigger church discipline." *Id.* ¶ 25 n.6.

¶134   In some instances, general demographic information on its own might be sufficient to undermine our confidence in the proceedings because there is a reasonable probability that at least one juror would be swayed by improper religious testimony. But

---

[24] At the time Lovell was sentenced, a majority of Utahns considered themselves to be members of the Church. *See Religious Landscape Study*, PEW RSCH. CTR., http://www.pewforum.org/religious-landscape-study/state/utah/ [https://perma.cc/W9L3-R2ZK].

we need not rely on just general demographics in this case. The record before us indicates that at least two of the seated jurors were familiar with the Church's religious materials, with one indicating that they read "anything on www.lds.org" and another saying they read the "Ensign."[25] And while not specific to the Church, another juror indicated that they read "religious based material."

¶135   The record developed at the 23B hearing establishes that the State believed that there would be members of the Church on the jury.[26] The prosecutor who questioned Newton testified at the 23B hearing that "in the State of Utah there are many individuals who are members of the Church . . . and so some of the members of the jury, very likely, would be affiliated with that particular faith." The prosecutor evidently decided that the religious testimony he elicited from Newton would be persuasive to the jury because of their apparent religious affiliation, and we have no reason to conclude otherwise.[27]

¶136   At its core, this religious testimony called on the jury to assign Lovell's mitigation evidence little weight because they could look to Lovell's Church status to determine that Lovell lacked

---

[25] Ensign magazine was a monthly magazine the Church published from 1971 until 2021 that contained material and articles related to the Church and its teachings. *See* Sean P. Means, *LDS Church Phasing Out Ensign, Its 50-Year-Old Magazine, for New Global Publications*, SALT LAKE TRIB. (Aug. 14, 2020), https://www.sltrib.com/religion/2020/08/14/lds-church-phasing-out/ [https://perma.cc/2RWE-MJ7G].

[26] The prosecutor "was . . . in a much better position to gauge how these particular . . . jurors might respond to this evidence than we are." *See State v. Vallejo*, 2019 UT 38, ¶ 79, 449 P.3d 39.

[27] We also find it informative that the State did not, after Newton's testimony had concluded, elicit any similar testimony from Lovell's other bishops, who were all questioned by different prosecutors than the one that examined Newton. At the 23B hearing, one of the senior prosecutors testified that they made "an on-the-fly decision" to change who would cross-examine the other bishops because they "didn't want to go down the road" that they did with Newton's cross-examination. This suggests that the State immediately recognized the prejudicial nature of the testimony it had elicited from Newton.

remorse and that he had not changed. The testimony impermissibly risked diminishing the jury's sense of responsibility for determining the appropriateness of death, and it is reasonably likely that a juror either based their sentencing decision on this testimony or used Newton's testimony to discount the mitigation evidence Lovell presented. Our confidence in the sentencing hearing has been undermined because there is a reasonable probability that at least one juror would have opposed imposition of the death penalty if the jury had not been exposed to this evidence. Lovell has met his *Strickland* burden of establishing that his counsel's errors prejudiced his sentencing.

## CONCLUSION

¶137    Lovell has not shown that his conviction for the murder of Joyce Yost should be overturned. We affirm his conviction.

¶138    Lovell's trial counsel rendered ineffective assistance when they failed to effectively object, or otherwise sufficiently respond, to testimony regarding Lovell's excommunication from the Church of Jesus Christ of Latter-day Saints and regarding the need for him to repent and demonstrate remorse to the Church's First Presidency before it could readmit him to membership. This evidence prejudiced Lovell's ability to have a jury fairly weigh the aggravating and mitigating factors, as Utah's capital sentencing statute requires, before it sentenced him to death. We vacate Lovell's sentence and remand for further proceedings.